[No. 66469-2.   En Banc.]

Argued January 14, 1999.     Decided July 29, 1999.

THE STATE OF WASHINGTON, *Respondent*, v. WWJ CORPORATION, ET AL., *Petitioners*.

*James E. Lobsenz* of *Carney, Badley, Smith & Spellman*, for petitioners.

*Christine O. Gregoire, Attorney General, Sally R. Gustafson, Senior Assistant*, and *David M. Horn, Assistant*, for respondent.

IRELAND, J. — WWJ Corporation and William and Rosemary Johnson were fined $500,000 for violating the Mortgage Broker Practices Act and the Consumer Protection Act 250 times. On appeal they argued the fine violates the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The Court of Appeals declined to address the newly raised constitutional issues. We find the Court of Appeals applied the incorrect standard in rejecting review of the constitutional claims, but we affirm nonetheless, finding the newly raised constitutional issues do not merit review under RAP 2.5(a)(3).

## FACTS

William Johnson was the sole owner of WWJ Corporation (WWJ), a mortgage broker business. Johnson operated WWJ from 1991 until July 1992, when he closed the business and sold WWJ's assets to DMG Mortgage, Inc. (DMG), a multistate mortgage brokerage organized under the laws of the State of Indiana. Johnson became the Northwest

regional manager of DMG and continued working as a mortgage broker in Washington State until the summer of 1994, when DMG closed its Washington offices.

The Attorney General began investigating Johnson's business after an appraiser complained about not being paid for its services.[1] In August 1992, the State brought this action against WWJ and the Johnsons, alleging violations of the Mortgage Broker Practices Act (MBPA), RCW 19.146, and the Consumer Protection Act (CPA), RCW 19.86. DMG was later added as a party. In September 1994, the State moved for summary judgment. One attorney represented all defendants, but filed no response to the summary judgment motion. Finding no contested facts, the trial court granted the State's motion and found against all defendants.[2] Hereinafter the Johnsons and WWJ will collectively be referred to as Johnson.

A brief summary of the violations and the trial court's award is necessary. Any violation of any section of the MBPA is a per se "unfair or deceptive act or practice . . . in violation of RCW 19.86.020." RCW 19.146.100. The Consumer Protection Act, RCW 19.86, provides for civil penalties not exceeding $2,000 for every violation of RCW 19.86.020. RCW 19.86.140. The trial court found the State's calculations, totaling 250 violations of the MBPA and CPA by Johnson, were conservative. The State requested, and the court granted, $32,254 in restitution, the State's attorney fees and costs, and the maximum $2,000 penalty per violation totaling a $500,000 penalty.

Of the 250 violations, one involved Johnson's failure to maintain business records in accordance with RCW 19.146.060, and the other 249 involved the following statute:

---

[1]The appraiser filed a complaint with the Bellevue Police Department, which forwarded the complaint to the Attorney General. The record does not reveal when this complaint was filed, or when the State's investigation began.

[2]DMG filed for bankruptcy and withdrew its appeal before the Court of Appeals. *See State v. WWJ Corp.*, 88 Wn. App. 167, 170 n.1, 941 P.2d 717 (1997). Our further recitation of the facts will focus solely on WWJ and Johnson's conduct.

A mortgage broker shall deposit, prior to the end of the next business day, all moneys received from borrowers for third-party provider services in a trust account of a federally insured financial institution located in this state. The trust account shall be designated and maintained for the benefit of borrowers. Moneys maintained in the trust account shall be exempt from execution, attachment, or garnishment. A mortgage broker shall not in any way encumber the corpus of the trust account or commingle any other operating funds with trust account funds. Withdrawals from the trust account shall be only for the payment of bona fide services rendered by a third-party provider or for refunds to borrowers. Any interest earned on the trust account shall be refunded or credited to the borrowers at closing.

Former RCW 19.146.050 (1994).[3]

The State presented, and the trial court found, 182 instances where Johnson charged borrowers a deposit for third party services and placed such deposits in non-trust accounts where they were commingled with other operating funds.[4] From these commingled accounts, Johnson wrote 67 checks which were not for third party services or customer refunds. Besides these 249 violations of RCW 19.146.050, the State did not count as violations the number of customers whose deposits were not refunded, or the number of third party providers who were not paid for their services.[5] Additionally, the State did not include all of the repetitive trust account violations, all of the transactions where operating funds were improperly deposited

---

[3]RCW 19.146.050 has since been amended.

This is arguably the most important provision in the entire MBPA. Anyone who violates *any other* provision of the MBPA is guilty of a misdemeanor, but the Legislature has mandated that violation of RCW 19.146.050 constitutes a class C felony under chapter 9A.20 RCW. *See* RCW 19.146.110.

[4]In fact, the State was unable to locate a single bank account which satisfied the requirements of RCW 19.146.050, and trial counsel for Defendants admitted he could not show that any of the properly designated trust accounts existed. In all likelihood, Johnson violated RCW 19.146.050 every single time he handled a client's deposit.

[5]The State produced five borrowers who were owed a total of $2,446 for deposit refunds, and five businesses which had not been paid a total of $29,733 for appraisals or credit reports. These two figures totaled together equal $32,179,

into accounts containing client funds, and all instances where clients' checks were not deposited in the bank prior to the end of the next business day after the checks were received.

The trial court found Johnson manifested an extreme lack of good faith and a pattern of disregard for the law. Johnson committed huge numbers of repetitive violations, and he continued doing so even after the State filed its action against him. Given the extensive documentation submitted to the trial court, the State could have proven far more than the 250 violations listed in its summary judgment motion. Additionally, Johnson's illegal conduct occurred at a time when there was a high market demand for refinancing, giving him further rein to abuse his customers' fiduciary trust with impunity. The trial court found Johnson's conduct caused substantial injury to the public, and the court imposed the maximum civil penalty per violation, in part to eliminate the benefits derived by Johnson from his violations.

Defendants appealed the judgment. Among other issues raised, Johnson challenged, for the first time, the amount of the civil penalty as violating both the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The Court of Appeals declined to reach the constitutional issues, holding they could not be raised for the first time on appeal. *State v. WWJ Corp.*, 88 Wn. App. 167, 173-74, 941 P.2d 717 (1997). Johnson petitioned for review. He urges this court to reach the constitutional issues and reverse the $500,000 civil penalty as violating the Eighth and Fourteenth Amendments.

## ANALYSIS

### A. The Court of Appeals' Decision

■ In dismissing review of the constitutional issues, the

---

and the actual restitution award against Johnson was $32,254. The $75 disparity between these two figures is unexplained.

Court of Appeals held newly raised constitutional issues are not considered on appeal in civil cases unless they involve the court's jurisdiction. *WWJ Corp.*, 88 Wn. App. at 173-74 & n.9 (citing *Rismon v. State*, 75 Wn. App. 289, 294, 877 P.2d 697 (1994) (citing *Aripa v. Department of Soc. & Health Servs.*, 91 Wn.2d 135, 141, 588 P.2d 185 (1978))). The appellate decision relied upon outdated common law, whereas we rely upon RAP 2.5(a) to decide the issue.

At common law, constitutional issues not raised in the trial court were not considered on appeal, with just two exceptions. *Robinson v. Peterson*, 87 Wn.2d 665, 675, 555 P.2d 1348 (1976). If a defendant's constitutional rights in a criminal trial were violated, such issue could be raised for the first time on appeal. *Id.* (citing *State v. Lampshire*, 74 Wn.2d 888, 447 P.2d 727 (1968)). Secondly, where a party raised a constitutional challenge affecting the jurisdiction of the trial court, an appellate court could also reach the issue. *Id.* (citing *Kueckelhan v. Federal Old Line Ins. Co. (Mut.)*, 69 Wn.2d 392, 418 P.2d 443 (1966)).

When this court adopted the Rules of Appellate Procedure in 1976, RAP 2.5(a) replaced the common-law rule for newly raised issues on appeal. RAP 2.5(a) states:

> The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right.

This rule makes no distinction between civil and criminal cases. The plain language of subsection three states a party may challenge for the first time on appeal a manifest error that affects a constitutional right. We have recognized that civil parties may raise constitutional issues on appeal if they satisfy the criteria listed in RAP 2.5(a)(3). *See Richmond v. Thompson*, 130 Wn.2d 368, 385, 922 P.2d 1343 (1996) (citing *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 577 n.4, 811 P.2d 231 (1991)). Subsection three is not restricted to constitutional claims affecting the jurisdiction

of the court. In fact, a challenge to the court's jurisdiction is addressed by an entirely different subsection—RAP 2.5(a)(1).

Some cases decided after adoption of the RAP, including *WWJ Corp.*, have erroneously adhered to the outdated common-law rule regarding newly raised issues on appeal. *See, e.g., Aripa v. Department of Soc. & Health Servs.*, 91 Wn.2d 135, 141, 588 P.2d 185 (1978) (civil parties may raise a new constitutional issue on appeal only if the issue affects the jurisdiction of the court); *Jones v. Industrial Elec.-Seattle, Inc.*, 53 Wn. App. 536, 539, 768 P.2d 520 (1989); *Department of Labor & Indus. v. Wendt*, 47 Wn. App. 427, 431, 735 P.2d 1334 (1987). These cases are overruled insofar as they are inconsistent with the plain language of RAP 2.5(a), which makes no distinction between civil and criminal cases.

B. Applying RAP 2.5(a)(3) to the Excessive Fines Claim

■ ■ We now review whether Johnson's claimed constitutional errors warrant review under RAP 2.5(a)(3). Because RAP 2.5(a)(3) is an exception to the general rule that parties cannot raise new arguments on appeal, we construe the exception narrowly by requiring the asserted error to be (1) manifest and (2) " 'truly of constitutional magnitude'." *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (quoting *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988)). RAP 2.5(a)(3) was not designed to allow parties "a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.' " *Scott*, 110 Wn.2d at 687 (quoting *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *aff'd in part, rev'd in part*, 99 Wn.2d 663, 664 P.2d 508 (1983)). If the record from the trial court is insufficient to determine the merits of the constitutional claim, then the claimed error is not manifest and review is not warranted. *McFarland*, 127 Wn.2d at 333 (citing *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993)). *Cf. State v. Contreras*, 92 Wn. App. 307, 311-14, 966 P.2d 915 (1998).

*McFarland* held an error is manifest if it results in actual

prejudice to the defendant. An equally correct interpretation of manifest error was given in *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992), where the court stated, "Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case." Under *Lynn*, an alleged error is manifest only if it results in a concrete detriment to the claimant's constitutional rights, *and* the claimed error rests upon a plausible argument that is supported by the record. To determine whether a newly claimed constitutional error is supported by a plausible argument, the court must preview the merits of the claimed constitutional error to see if the argument has a likelihood of succeeding. Reading *manifest* in this way is consistent with *McFarland*'s holding that exceptions to RAP 2.5(a) should be construed narrowly. The policy behind RAP 2.5(a)(3) is simply this: Appellate courts will not waste their judicial resources to render definitive rulings on newly raised constitutional claims when those claims have no chance of succeeding on the merits.

Johnson's excessive fines claim involves a genuine constitutional issue, but the record is insufficiently developed to evaluate its merits. Without a developed record, the claimed error cannot be shown to be manifest, and the error does not satisfy RAP 2.5(a)(3). *See Riley*, 121 Wn.2d at 31 (declining to consider defendant's Fourth Amendment claim because the record was insufficiently developed to consider the claim).

Johnson claims the $500,000 fine violates the Excessive Fines Clause under the "grossly disproportional" test recently adopted in *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 2036, 141 L. Ed. 2d 314 (1998). The Eighth Amendment states:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. CONST. amend. VIII.

To determine whether Johnson's claim is manifest under

RAP 2.5(a)(3), we will assume the Excessive Fines Clause applies to Johnson's fine,[6] and assume the standard set out in *Bajakajian* applies in this case. Under *Bajakajian*, a fine is excessive if it is grossly disproportional to the gravity of the defendant's offense. The record lacks the necessary information to determine the gravity of Johnson's egregious violations of the MBPA and CPA.

Johnson claims the gravity of his offenses is measured by the $32,254 restitution award, and he then claims the $500,000 fine is disproportional to the amount of restitution. However, the $32,254 restitution award does not represent the total gravity of Johnson's illegal conduct over the two years of WWJ's operation. When the State filed this action, it included only restitution claims for those few clients and third-party service providers who had come forward to complain to the State about WWJ's conduct. Even if the restitution award had included every single injured person's claim, the gravity of Johnson's violations is not limited just to the actual damages inflicted. *See* RCW 19.146.050 (discussed below).

All but one of Johnson's 250 violations involved improper handling of clients' funds—funds which *were not* Johnson's property. Johnson did not deposit clients' funds in the statutorily required trust accounts, designated and maintained for the benefit of borrowers, and exempt from execution, attachment, or garnishment. *See* RCW 19.146.050. Johnson commingled his clients' funds with other operating funds, and withdrew money from those commingled accounts for purposes other than refunds to clients or payments to third party service providers, again violating the provisions of RCW 19.146.050. Johnson violated the fiduciary trust of every single client with whom he did business by improperly handling client funds. Every customer whose funds were improperly handled was potentially harmed by

---

[6]It has not been determined that the Excessive Fines Clause applies to the states, nor that it protects corporations as well as individuals. *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 n.22, 109 S. Ct. 2909, 106 L. Ed. 2d 219 (1989). The parties also dispute whether Johnson's civil fine constitutes punishment for purposes of the Excessive Fines Clause.

Johnson's offenses, even if he or she did not suffer actual damages.

The gravity of Johnson's offenses includes the gross violation of his fiduciary duty to his clients, but even more is involved. The gravity of Johnson's conduct also includes the greater potential harm to consumer confidence in the mortgage broker industry. That Johnson's conduct has negative impacts beyond those clients who suffered actual or potential damages is demonstrated by the Legislature's own findings:

> The legislature finds and declares that the brokering of residential real estate loans substantially affects the public interest. The practices of mortgage brokers *have had significant impact on the citizens of the state* . . . . It is the intent of the legislature to establish . . . rules of practice and conduct of mortgage brokers *to promote honesty and fair dealing with citizens and to preserve public confidence* in the lending and real estate community.

RCW 19.146.005 (emphasis added). Johnson's years of illegal mortgage brokering, especially at a time when the demand for such services was high, eroded the public confidence in the business. This must be taken into account when determining the gravity of Johnson's offenses for purposes of weighing the proportionality of the fine.

In bringing this action under the CPA, the State had no need to attempt to delineate the total gravity of Johnson's conduct. In granting the State's motion for summary judgment, the trial court likewise had no need to delineate the full extent of harm actually and potentially caused by Johnson's illegal acts.[7] The record fails to reveal the total number of customers Johnson may have potentially harmed by mishandling their deposits. The State offered a conservative calculation that Johnson mishandled $148,834 of his clients' funds, but even this figure fails to represent the total gravity of Johnson's offenses. Since the record

---

[7]Had Johnson objected to the size of the requested fine at the trial level, the State and the court would have had the opportunity to address the issue.

contains insufficient data to enable this court to grasp the total gravity of Johnson's offenses, we cannot determine the merits of Johnson's excessive fines claim. As such, the claimed error has not been shown to be manifest, and review is not warranted under RAP 2.5(a)(3).

C. Applying RAP 2.5(a)(3) to the Due Process Claim

Johnson challenges the $500,000 fine as being so arbitrary and capricious as to violate the Due Process Clause of the Fourteenth Amendment. This claim involves a genuine constitutional issue, but Johnson again fails to show the claimed error is manifest. The United States Supreme Court has adopted a test for determining whether a punitive jury award is so grossly excessive as to violate the Due Process Clause of the Fourteenth Amendment. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). Johnson urges this court to scrutinize his civil penalty in light of *BMW*. For the sole purpose of analyzing whether this claim is manifest under RAP 2.5(a)(3), we will accept Johnson's argument and apply *BMW* to his fine.[8] Johnson, however, has not shown how his $500,000 fine violates the Due Process Clause under *BMW*'s analysis.

*BMW* used three guideposts in weighing the excessiveness of a punitive award against the car company. *BMW*, 517 U.S. at 574-75. First, the court analyzed the degree of reprehensibility of BMW's conduct. *Id*. at 575-80. Second, the court compared the amount of the award with the actual and potential harm caused by BMW's conduct. *Id*. at 580-83. Third, the court compared the amount of the punitive award with the amount of civil penalties authorized by statute in comparable cases. *Id*. at 583-84. Implicit in this third guidepost is the question of whether the offender had fair notice that the offensive conduct could potentially incur such a high amount of penalties or damages.

BMW's conduct was found to be in good faith. *Id*. at 580.

---

[8]We decline to decide at this time whether *BMW* applies to statutorily imposed civil penalties.

The $2 million punitive award was more than 500 times the amount of actual harm found by the jury. *Id.* at 582. Finally, comparable civil sanctions for similar conduct ranged from $2,000 to $10,000, such that BMW had no fair notice that as few as 14 alleged violations could subject BMW to a $2 million penalty. *Id.* at 584. The Supreme Court held the $2 million award was unconstitutionally excessive, in violation of the Due Process Clause of the Fourteenth Amendment.

The *BMW* guideposts are all satisfied in this case to justify the $500,000 penalty. First, Johnson's conduct was found to be egregious, willful, and repetitive. Second, the amount of actual and potential harm caused by Johnson's illegal use of customer deposits over a two-year span is difficult to determine from the record, but is at least $148,863 as argued by the State, constituting a ratio of less than four to one. A ratio of four-to-one with Johnson's fine is clearly reasonable.[9] Finally, Johnson had full and fair statutory notice that each violation of the MBPA constituted a per se violation of the CPA, with each violation being punishable by a civil fine of up to $2,000. If *BMW* applied to Johnson's $500,000 civil fine, Johnson has not shown how the fine is unconstitutional. This claimed constitutional error is not manifest, and does not warrant review under RAP 2.5(a)(3).

In conclusion, we reverse the Court of Appeals' holding insofar as it fails to acknowledge RAP 2.5(a)(3) as control-

---

[9]*BMW* explicitly eschewed the use of fixed formulas to determine whether punitive awards are disproportionate to the impact of the wrongful conduct:

> Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. . . . It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said . . . in *Haslip:* 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus.' "

*BMW,* 517 U.S. at 582-83 (quoting *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 458, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993) (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991))).

ling on the issue of newly raised constitutional errors. Nonetheless, we find Johnson's claimed constitutional errors are not manifest as required by RAP 2.5(a)(3), so the Court of Appeals reached the correct result in declining to review the newly raised issues.

GUY, C.J., and DURHAM, SMITH, MADSEN, and TALMADGE, JJ., concur.

ALEXANDER, J. (dissenting) — I agree with the majority's conclusion that the Court of Appeals applied an incorrect standard in rejecting review of the constitutional claims raised by Johnson in his appeal. As the majority recognizes, the basis of the defendants' claim is that the trial court committed a manifest error affecting a constitutional right. The claim may, therefore, be reviewed, provided we conclude that the asserted error is indeed "manifest" and of constitutional magnitude. I disagree, though, with the majority's determination that we should deny review to Johnson on the basis that his claim of constitutional error is not "manifest" in that it is so lacking in merit that there is no chance of succeeding. For reasons set forth hereafter, I am of the view that the imposition of a $500,000 fine upon Johnson, in addition to the requirement that he pay restitution, attorney fees, and costs, is so extreme as to violate the Excessive Fines Clause of the Eighth Amendment and Due Process Clause to the Fourteenth Amendment of the United States Constitution.

As the majority observes, the Eighth Amendment to the United States Constitution provides that excessive fines shall not be imposed. Essentially, this provision serves to prohibit the government from imposing excessive fines as punishment. Even a civil sanction is punitive if "it can only be explained as serving in part to punish." *Austin v. United States*, 509 U.S. 602, 610, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993). It is readily apparent to me that the sanctions authorized by RCW 19.86.140 are punishment within the meaning of the Excessive Fines Clause. The

$2,000 per violation sanction is described in the statute as a "civil penalty," it is payable to the State, and it is imposed in addition to restitution, attorney fees, and costs authorized by RCW 19.86.080. Significantly, the trial court indicated in its summary judgment order that the "penalty is intended to punish and is not compensation for any actual pecuniary loss." Clerk's Papers (CP) at 59. In short, the civil penalty imposed here is indistinguishable from a fine imposed in a criminal case.

The more pertinent question is whether the punishment (fine) is excessive. A punitive fine is excessive under the Excessive Fines Clause if it is grossly disproportionate to the gravity of the defendant's offense. *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998). Although, as the United States Supreme Court noted in *Bajakajian*, any judicial determination regarding the gravity of an offense will be inherently imprecise, a good place to start the analysis, in my judgment, is to gauge the fine in relation to the harm caused by the offense. Using that standard, I fail to see how the $500,000 fine imposed on Johnson can be viewed as anything other than disproportionate to the offenses committed by him.[10] Significant in that regard is the trial court's finding that the persons harmed by Johnson would be made whole by payment of $32,254 in restitution. A $500,000 fine on top of $30,225.08 in attorney fees and costs is far out of proportion to the demonstrable harm caused to the persons who were the victims of Johnson's offenses.

Without doubt *Bajakajian* is the leading case on the Eighth Amendment issue. Indeed, the Court noted there that heretofore it "has had little occasion to interpret, and has never actually applied, the Excessive Fines Clause." *Bajakajian*, 524 U.S. at 327. Nevertheless, it applied the provisions in that case in which the defendant's offense was attempting to leave the United States without report-

---

[10]The majority fails to mention that the trial court imposed a civil penalty on another defendant in the case, DMG Mortgage, in the amount of $1,802,000 and also ordered it to pay restitution costs and attorney fees in an amount in excess of $100,000.

ing that he was transporting more than $10,000, to wit: $357,144. Pursuant to the provisions of a federal statute, the United States government sought forfeiture of the entire sum that was seized in transit. The Supreme Court concluded that such a penalty would be grossly disproportionate and would constitute an excessive fine. In reaching its decision, the Court emphasized the fact that although the failure of the defendant to report the transportation of a large sum of money affected only the government, the effect was "minimal." *Bajakajian*, 524 U.S. at 339. Here, the same can be said. The victims of Johnson's offenses were presumably made whole by the restitution order and yet the State, like the United States government in *Bajakajian*, stands to reap a huge benefit from a fine when the harm it suffered was slight if nonexistent.

I would hold that the civil penalty imposed here also offends the Due Process Clause of the Fourteenth Amendment. Although the United States Supreme Court has not considered whether a punitive fine violates due process, it did, in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996), set forth a test for determining whether a punitive damage award is so grossly excessive as to violate the clause. The *BMW* test is remarkably similar to *Bajakajian*'s excessive fines test and I see no reason why it would not apply here. As noted above, the harm caused to the victims was slight in comparison to the fine. It defies reason that the State, which was not harmed in any tangible way by Johnson's conduct,[11] should obtain a fine that exceeds the amount of the harm caused to the victims by over 15 times.

Apparently recognizing that the fine imposed here was far out of proportion to the harm caused by the defend-

---

[11]I recognize that the trial court indicated in its summary judgment order that the actions of all of the defendants (WWJ, Johnson, and DMG) caused "substantial injury to the public." CP at 59. I see nothing in the record, though, that quantifies the degree of injury to the public other than those members of the public who were intended to benefit from the restitution orders. A more telling reason for the extreme fine, one no doubt advanced by the State, is what the trial court described as "the necessity of vindicating the authority of the Attorney General of Washington in enforcing the Consumer Protection Act." CP at 59.

ants' offenses, the majority attempts to justify it by asserting that the "record contains insufficient data to enable this court to grasp the total gravity of Johnson's offenses." Majority op. at 605-06. It is remarkable to me that the majority endeavors to justify this huge fine on the lack of a record and speculation that the "State could have proven far more than the 250 violations listed in its summary judgment motion." Majority op. at 600. The State presented the case that it did in support of its summary judgment motion and the trial court based its ruling on the State's submissions.[12] That is the record. It is, in my view, entirely inappropriate for this court to provide bootstraps for the State's argument in the form of speculation about what the State really could have shown if it had simply bothered to do so. The plain fact is that the $500,000 fine is excessive on its face, and it is unsatisfactory to deny relief to Johnson on the basis that he presented insufficient evidence to counter vague assertions that he really caused greater harm than was determined by the trial court. I would hold that the fine violates both the Excessive Fines Clause of the Eighth Amendment and Due Process Clause of the Fourteenth Amendment to the United States Constitution and would, therefore, reverse.

JOHNSON and SANDERS, JJ., concur with ALEXANDER, J.

---

[12]My review of the record before the court on summary judgment causes me to conclude that the State produced evidence of only 240 violations of which only 219 were included in its request for civil penalties. The 219 violations can be divided into two categories: one is the failure of defendants to place customer funds in trust accounts. The other category is the commingling of operating funds with customer trust funds.