

2015 JUL 27 ⸗ 1: 3⸗

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71948-3-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| MICHAEL PENEUETA, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: July 27, 2015 |

SPEARMAN, C.J. — Following a gang-related shooting in which no one was injured, the State charged Michael Peneueta with first degree unlawful possession of a firearm and three counts of second degree assault against three victims, one bystander and two alleged to be involved in the shooting. At the defense's request, the trial court instructed the jury on self-defense. The court also gave a first-aggressor instruction sua sponte. Neither party objected to these instructions. The jury found Peneueta guilty of unlawful possession of a firearm and two counts of second degree assault. Peneueta claims for the first time on appeal, that the court erred in giving the first aggressor instruction. He also claims that defense counsel provided ineffective assistance of counsel when he failed to object to the first aggressor instruction. Because Peneueta fails to show that giving the first aggressor instruction constituted manifest constitutional error,

No. 71948-3-I/2

we decline to review the claim on appeal. We also reject his claim of ineffective assistance of counsel.

FACTS

On May 3, 2015, around 11:00 a.m., Michael Peneueta and James Perkins were walking toward a medical marijuana dispensary on Rainier Avenue South when they saw a silver Crown Victoria driven by Amrico Flight. Flight was a known member of the East Union Street Hustlers (Union Street), a central district gang and known rival of Down With the Crew (D-Dub), a south end gang with which Peneueta was affiliated. Union Street's territory is in Seattle's central district, around Union Street. D-Dub's territory is south Seattle, including the area of Rainier Avenue South between 42nd Avenue South and Dawson/39th Avenue South. Gang members understand the boundaries and generally live within them. As they were walking, Peneueta told Perkins, "If I see him again, I'm going to shot at him." Verbatim Report Proceeding (VRP) (3/17/14) at 22.

A short time later, Flight and another man, identified by the dispensary owner as Donald Massey, went into the dispensary. They remained inside for a few minutes and then left.

Perkins and Peneueta were crossing the street on Rainier toward the dispensary when Flight and Massey were leaving. Peneueta saw Flight and, according to Perkins, yelled "D-Dub" as they were walking across the street from the dispensary. Perkins understood this to be an assertion that Flight was on Peneueta's turf. Perkins testified that, after this initial contact, Flight walked to his

2

car, a Crown Victoria, and started driving north on Rainier Avenue. Jennings also saw Flight and Massey drive northbound on Rainier Avenue after sitting for a few minutes in Flight's car.

According to Perkins, at some point Flight stopped the car, rolled down the window, and pointed a .38 or .380 gun at them. Peneueta then drew his own gun and opened fire at Flight. Perkins was not expecting Peneueta to pull out a gun from his pants pocket. Perkins stated that, though Flight was the first to pull out a weapon, he was unsure whether Flight actually fired his gun or whether Flight or Peneueta shot first. In a statement to Detective Damon Deese of the Seattle Police Department, given shortly after the shooting, Perkins did not state that Flight ever drew or shot a gun.

Meanwhile, Theresa Strutynski, who had been driving northbound on Rainier Avenue behind Flight's Crown Victoria and a black Mercedes, saw two men, later identified as Peneueta and Perkins, walk into the middle of the street. Strutynski drove past them and was looking straight ahead when she heard gun shots coming from behind her car. Prior to hearing the gun shots behind her, Strutynski did not hear or see any gunshots in front of her. Nor did she testify to seeing a person with a gun in the cars in front of her. After she heard the gun shots behind her, Strutynski turned around and saw Peneueta with a gun in his hand. Strutynski then heard a popping noise and looked forward again. At this point, she noticed a hand with a gun reaching out of the passenger side window of the black Mercedes driving slowly in front of her. She heard two more popping

3

sounds coming from the direction of the Mercedes. Strutynski testified that she believed Peneueta fired his gun before the person in the Mercedes.

The surveillance video showed a silver Crown Victoria driving off, followed by a black Mercedes. Strutynski's car, a tan Lexus, can be seen driving directly behind the Mercedes. Two males are seen running across the front of the marijuana dispensary, one of them firing a handgun.

After the shooting, police were dispatched to the scene to look for suspects. Based on descriptions given by Jennings, Strutynski, and another witness, Maria Harris, police located Perkins, who fit the description of one of the suspects, hiding in the backyard of a nearby residence. A .45 caliber gun was found underneath a bucket nearby. The gun was the same caliber as the shell casings recovered from the street after the shooting and the recovered magazine would have fit the gun had it not been damaged.

Police officers also contacted Peneueta as a potential suspect. According to Officer Jason Lee, during this initial contact Peneueta appeared calm, but was sweating profusely. Officer Lee testified that Peneueta saw occupants of a silver Crown Victoria shooting at a black Mercedes, but was not otherwise involved. After this initial contact, Officer Lee released Peneueta because none of the witnesses could positively identify him as a suspect.

Three days after the shooting Detective Deese, contacted Peneueta again. During their telephone conversation, Peneueta gave the detective a slightly different account of the events of May 3. He told the detective he had

been walking from his grandmother's house to the marijuana dispensary on Rainier Avenue with a friend, James Perkins, when he saw a driver in a Crown Victoria look at them suspiciously. Peneueta stated he had not recognized the driver, but the driver appeared to recognize Peneueta. According to Peneueta, the car drove off and he and Perkins continued on their way. Peneueta stated that when they arrived at the dispensary, they saw the Crown Victoria again, followed by a black Mercedes. He believed the cars were together, though he had not recognized anyone in the Mercedes. He saw the driver of the Crown Victoria and a passenger from the Mercedes go inside the dispensary. On their way out, one of the two men asked Peneueta and Perkins, "what you looking at?" VRP (3/12/14) at 71. Then, as the men drove off, the passenger of the Mercedes pulled out a gun and fired at Peneueta and Perkins. Peneueta and Perkins ran off. Peneueta denied having a gun during the incident and denied seeing Perkins with a gun.

Police eventually located Flight and Massey, but were unable to identify the black Mercedes or any individuals that were inside.

The State charged Peneueta with first degree unlawful possession of a firearm and three counts of second degree assault against Strutynski, Flight, and Massey. At trial, Peneueta initially advised the court that he did not intend to argue, that he acted in self-defense, but later asked the court whether a self-defense instruction would be available on the facts of the case. The trial court reserved ruling on the issue, but ultimately decided to instruct the jury on self-

defense and also, sua sponte, gave a first aggressor instruction. Peneueta did not object. The instruction provided:

> A person may not, by an intentional act of physical aggression which is reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor and that his acts or conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers (CP) at 43.

Based on this instruction, the State argued in closing that self-defense was not available if Peneueta shot first. In his closing remarks, Peneueta relied primarily on a theory of mistaken identity. He argued that Perkins was the likely shooter and because Perkins had a motive to blame Peneueta for the shooting, he was not a credible witness. Peneueta argued self-defense only in passing when he asserted that the State had not met its burden of disproving self-defense beyond a reasonable doubt. Significantly, in so doing he did not concede that he ever held or fired the gun.

The jury found Peneueta guilty of unlawful possession of a firearm and two counts of second degree assault as to Strutynski and Flight. The State dismissed the remaining assault charge. Peneueta timely appeals the judgment and sentence.

## DISCUSSION

### RAP 2.5

Citing RAP 2.5(a), the State contends that Peneueta waived any claim of error as to the first aggressor instruction because he failed to object to the instruction at trial. The State argues that because he cannot show that any error in giving the instruction constituted manifest constitutional error, his claim is not subject to review under RAP 2.5(a)(3). Peneueta concedes that he did not object to the first aggressor instruction below, but argues review is proper under RAP 2.5(a)(3). We agree with the State.

An appellate court may refuse to review any claim of error not raised in trial. RAP 2.5(a). An exception exists, however, for a "manifest error affecting a constitutional right." RAP 2.5(a)(3). To determine whether an error affecting constitutional rights is manifest, the reviewing court first makes a cursory determination as to whether the alleged error in fact suggests a constitutional issue. If so, then the court determines if the error is manifest. To decide this issue, the court must determine whether there is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992); State v. WWJ Corp., 138 Wn.2d 595, 602, 980 P.2d 1257 (1999). Stated differently, a constitutional error is manifest only where the appellant can show "actual prejudice." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). (citing State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)). We conclude that

7

while Peneueta raises a constitutional issue, he fails to establish that any error was manifest.

Due process requires the State to prove every element of the charged offense beyond a reasonable doubt before a judgment of guilty may be entered. State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). Once a claim of self-defense is asserted, the absence of self-defense becomes an element of the crime that the State has the burden to disprove beyond a reasonable doubt. State v. McCullum, 98 Wn.2d 484, 493-494, 656 P.2d 1064 (1983). In this case, however, the jury was instructed that if it determined Peneueta was the first aggressor then his self-defense claim was not available. Such an instruction prevents the jury from considering whether the State has proved beyond a reasonable doubt that the defendant did not act in self-defense. State v. Gordon, 172 Wn.2d 671, 677, 260 P.3d 884 (2011); O'Hara, 167 Wn.2d at 105. Therefore, the first aggressor instruction, if erroneous, implicates a defendant's constitutional rights.

The next question is whether Peneueta has made a plausible showing that the asserted error had practical and identifiable consequences on his self-defense claim. Appellate courts analyze unpreserved claims of error involving self-defense instructions on a case by case basis to assess whether the claimed error is manifest constitutional error. O'Hara, 167 Wn.2d at 104. We conclude that Peneueta has not made the requisite showing.

8

A jury may find that a defendant acted in self-defense based on evidence that the defendant reasonably believed that he or she was in danger of imminent harm, even if not in actual danger. State v. LeFaber, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), abrogated by O'Hara, 167 Wn.2d 756. Here, overwhelming evidence establishes that Peneueta did not have a reasonable belief of imminent harm. Accordingly, we conclude that he fails to show that he was actually prejudiced by the jury's inability to consider his self-defense claim.

The only basis for Peneueta's self-defense claim arose during Perkins's testimony that Flight was the first to draw a gun and that Peneueta fired at Flight in response. All of the other evidence presented at trial including the statements of Perkins and Peneueta given shortly after the shooting, contradicted Perkins's testimony. Although Peneueta did not testify, two statements he gave to police following the shooting were admitted into evidence. In neither statement did Peneueta assert that he was in fear of imminent harm and acted in self-defense. On the contrary, he denied even having or shooting a gun. Perkins stated to Detective Deese and also testified at trial that when Peneueta first saw Flight he said "If I see him again, I'm going to shoot him." VRP (3/17/14) at 22. When Peneueta saw Flight again, he yelled "D-Dub," which Perkins understood to be a declaration that Flight was on his turf. Id. at 22-23, 25. Almost immediately following that declaration, Peneueta fired his gun at Flight. Perkins acknowledged in his testimony that in his statement to Detective Deese, he never mentioned

that at any time during the incident Flight pointed or shot a gun at Peneueta or any other person.

On this evidence, we conclude that Peneueta has failed to make a plausible showing that the first aggressor instruction, even if erroneous, had any practical and identifiable consequences on the trial. The evidence is overwhelming that Peneueta's did not have a reasonable belief that he faced imminent harm when he fired the gun at Flight, and therefore he did not act in self-defense.

Moreover, we find it significant that Peneueta's primary theory of defense at trial was one of mistaken identity, not self-defense. In closing argument, Peneueta attacked Perkins as an incredible witness to the extent it put Peneueta at the scene at all, let alone shooting a gun. Indeed, he pointed to evidence that the gun actually belonged to Perkins and argued that Perkins "clearly had a motive to not tell the truth, as indicated on the stand. Obviously if he admitted that he was the one holding the gun, then he'd be charged with assault too, so there's a very good reason for him to try to pin the blame on someone else. . . ." VRP (3/17/14) at 80-81. He also argued that "all the factors point to [Perkins] being the one with the gun and being the shooter. Just to try and take the blame off himself, he blamed Mr. Peneueta." Id. at 83. Peneueta made only one passing reference to self-defense in his closing remarks:

> So getting back to the lawful force, if you're defending yourself
> from someone who's pointing a gun at you, then the use of a
> handgun also is lawful under those circumstances. And again it's
> the State who has to disprove that the actor was acting in self-

10

defense and the burden of that proof is beyond a reasonable doubt. You have to find beyond a reasonable doubt that there was no self-defense that occurred here."

Id. at 82.

In light of Peneueta's arguments belittling the credibility of the only witness to suggest that he acted in self-defense and his failure to argue the claim to the jury in any meaningful way, the giving of the first aggressor instruction, even if erroneous, did not cause him actual prejudice in the trial. We conclude therefore, that the first aggressor instruction, if erroneous at all, was not manifest error affecting a constitutional right. Accordingly, the claimed error is waived and we decline to consider it on appeal.

### Ineffective Assistance of Counsel

Peneueta claims he received ineffective assistance of counsel when his lawyer failed to object to the first aggressor instruction. We review such claims de novo. State v. Cross, 156 Wn.2d 580, 605, 132 P.3d 80 (2006). A lawyer is ineffective when (1) his or her performance is so deficient that it falls below an objective standard of reasonableness based on consideration of all of the circumstances and (2) the deficient performance prejudiced the defense, i.e. there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. State v. Thomas, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Regarding the first prong, scrutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness. Id. In addition, to succeed on a claim that

11

counsel's performance was deficient, the burden is on the defendant to show that there were no tactical or strategic reasons to justify counsel's challenged conduct. State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995).

Here, there is strong evidence that counsel's decision not to object to the first aggressor instruction was strategic. He initially informed the court that Peneueta did not intend to argue self-defense at all. It is apparent from the record that defense counsel viewed the theory that Peneueta had not been involved in the shooting as his strongest defense. This was a logical choice given that the gun was found in the vicinity of Perkins at the time of his arrest. In addition, evidence of self-defense was virtually non-existent, except for the testimony of Perkins, whom Peneueta intended to blame for the crime. In light of these circumstances, defense counsel chose not to focus on the issue of self-defense in either examining the witnesses or closing argument. It is entirely conceivable that defense counsel also chose to disregard the first aggressor issue because it was immaterial to the main thrust of the theory of defense. Thus, the failure to object was a decision consistent with counsel's trial strategy and we will not find counsel ineffective if the actions complained of go to the theory of the case or to trial tactics. State v. Garrett, 124 Wn.2d 504, 520, 881 P.2d 185 (1994).

Peneueta's ineffective assistance of counsel claim also fails because he cannot show prejudice. As discussed previously, there was overwhelming evidence that Peneueta did not act in self-defense. Accordingly, even assuming

12

No. 71948-3-I/13

the instruction was error, there is no reasonable probability that the outcome of the trial would have been different had defense counsel timely objected to it.

Because Peneueta fails to establish both deficient performance and prejudice, we find his ineffective assistance claim without merit.

Affirm.

WE CONCUR:

13