# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 72419-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| VICTOR CONTRERAS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 9, 2015 |
| | ) | |

APPELWICK, J. — Contreras appeals his convictions for first degree assault and unlawful possession of a firearm. He contends certain testimony was an impermissible opinion on his guilt and a comment on his right to remain silent. He also raises claims relating to ineffective assistance of counsel, prosecutorial misconduct, jury unanimity, and inadequate findings. We affirm.

## FACTS

Based on allegations that Victor Contreras participated in a gang related shooting in the Beacon Hill neighborhood of Seattle, the State charged him with three counts of first degree assault and one count of first degree unlawful possession of a firearm.

At trial, the State's evidence showed that Contreras and his codefendant, Douglas Ho, were members of a gang known as the Insane Boyz. Lawrence West, Troung Ngo, and William Ngeth belonged to a rival gang knows as the

Tiny Raskal Gangsters. Gang unit detectives testified that the two gangs had carried out a series of retaliatory shootings against each other in April and May, 2012.[1]

On the evening of July 22, 2012, West, Ngo, and Ngeth were stopped in Ngeth's car at an intersection on Beacon Hill when, according to West, a tan car with a black hood pulled up next to them. The car matched the description he had been given of an "enemy's car." West testified that Contreras was driving the car, Ho was seated in the front passenger seat, and a third person was in the back. Ho suddenly emerged from the tan car's sunroof holding a gun. West heard a gunshot followed by the sound of something striking Ngeth's vehicle. Ngo largely corroborated West's testimony but claimed the shot was fired from the driver's window by the driver or a passenger leaning over the driver's seat.

A high speed chase ensued with Contreras's vehicle chasing Ngeth's on Beacon Hill. The chase ended some 20 blocks later when Ngeth's vehicle crashed onto a curb near 22nd Ave. S. and S. Lucille Street. West, Ngeth, and Ngo left their car and ran. West testified that Contreras and Ho pulled up, got out of their car, and began shooting. West suffered bullet wounds to his torso and arm.

---

[1] A detective described seven shootings, including an April 2012, drive-by shooting at Ho's home, another a week later at Ho's elderly neighbor's home, a shooting of two Tiny Raskal Gangsters several days after that, and four shootings over a period of hours at the homes of Insane Boyz and Tiny Raskal members. The pattern of victims provided circumstantial evidence that the shooters were members of the Insane Boyz and Tiny Raskal gangs.

Multiple residents heard or observed the car chase and/or the Lucille Street shooting. The shooting lasted over a minute, with at least 15 rounds being fired, before the shooters left the scene. Witnesses described the color of the shooters' vehicle as light tan, gold, or silver but offered little in the way of descriptions of the shooters.

Police found numerous bullet casings at the scene. They also found bullet fragments and holes in a house, two parked cars, a fence, and a railing. A detective testified that, based on the location of the casings, fragments, and damage, there were at least two shooters. Both began firing in the intersection of 22nd and Lucile. A shooter using a .45 caliber firearm moved north along 22nd and shot eastward towards the interior of the block. Another shooter using a .40 caliber firearm moved east from the intersection along Lucile and shot northward toward the interior of the block. Police also found a bullet casing at the intersection of Spokane Street and Beacon Avenue where Ho allegedly fired a single shot from the sunroof of Contreras's car.

Police briefly detained West, Ngeth, and Ngo, determined they were unarmed, and released them. No firearms were discovered in their car or in the vicinity of the shooting.

Two days later, police located Contreras, Ho, and a "tan-gray" Honda with a black hood at a barbeque site in Seward Park. Several other suspected members of the Insane Boyz were present  Police obtained and executed a search warrant for Contreras's car. They found a .45 caliber Glock pistol under the driver's seat, a .40 caliber Taurus pistol in the glove box, and boxes of .45

caliber and .40 caliber ammunition inside the car. Police obtained consent to search another car belonging to the girlfriend of one of the Insane Boyz. They recovered a Kimber .45 caliber pistol from the car's trunk. Forensic tests determined that the casings found at the shooting scenes were fired from these firearms. In addition, Ho's fingerprints were found on the magazine of the Kimber pistol.

Police arrested Contreras and Ho at the barbeque and interviewed them at the police station. Following Miranda[2] warnings, both "denied any knowledge" of the shooting but could not remember where they were that night. Detective Sevaaetasi described their attitude as "nonchalant" and "indifferent":

Q. Did both of them give the same kind of answers?

A. Yes. They had -- they were -- they were kind of indifferent to the whole incident, being interviewed, being advised of their rights. It was like nonchalant to them, and I found this not at all unusual.

Q. The nonchalance you didn't find unusual?

A. Yeah, or the indifference to it and that there was similar behavior.

Q. Explain nonchalance and indifference.

A. Well, you know, normally you would arrest someone, put them in handcuffs, and take them to the police station. They would -- some protestation about guilt or innocence or whatever or why they're there. There was no such attitude from them. They were -- really kind of indifferent, just sat there. And when asked them if they could account for their—their whereabouts, it was, "I don't remember. I don't know."

_____

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, (1966).

Detective Wendy Moss testified that signals from Ho's and Contreras's cell phones hit cell phone towers in South Seattle shortly before the shooting. Later, around the time of the shooting, their phone signals hit a tower at Jefferson Golf Course, a short distance from the Lucille Street shooting on Beacon Hill. After the shooting, both phones hit off towers by Boeing field and then off towers in Kent.

Neither Contreras nor Ho testified or called any witnesses. In closing argument, the State theorized that Ho was the shooter firing the Kimber, Contreras fired the Glock, and an unknown third person fired the Taurus. The prosecutor emphasized, however, that the State need not prove who shot the guns since Ho and Contreras were charged as both principals and accomplices. Defense counsel argued that West's identification of Ho and Contreras was the only concrete identification evidence and that it was not credible. Counsel noted that Contreras admitted lying to police in his initial statements and argued that his testimony was motivated and tainted by the gang rivalry. In rebuttal, the prosecutor argued that the defendants' counsel had "gone through in their closing and tried to explain away or dismiss every single piece of the State's evidence. But it gets to a point where you lose -- where it becomes nonsensical." Ho's counsel objected to this argument, but the objection was overruled.

The court read a stipulation to the jury that both Contreras and Ho had prior convictions for serious offenses and were prohibited from possessing firearms on July 22-23, 2012.

The jury returned guilty verdicts on all counts and a special verdict finding Contreras was armed with a firearm. After hearing additional testimony, the jury also found the offenses were committed with intent to benefit a criminal street gang. Contreras appeals.

## DISCUSSION

For the first time on appeal, Contreras contends Detective Sevaaetasi's testimony describing his postarrest demeanor amounted to an impermissible opinion on guilt and a comment on his right to remain silent. He concedes he did not object to the testimony below, but claims it was manifest constitutional error that can be raised for the first time on appeal. We disagree.

Appellate courts generally do not consider issues raised for the first time on appeal. RAP 2.5(a); State v. Kirkman, 159 Wn.2d 918, 926, 155 P.2d 125 (2007). A narrow exception exists for "manifest" errors affecting constitutional rights. RAP 2.5(a)(3); State v. King, 167 Wn.2d 324, 332, 219 P.3d 642 (2009). It is the appellant's burden to demonstrate manifest constitutional error, i.e., error that affects constitutional rights and results in actual prejudice. State v. O'Hara, 167 Wn.2d 91, 98-100, 217 P.3d 756 (2009). Contreras has not carried that burden.

## I. Opinion on Guilt

No witness may offer an opinion as to the guilt of a defendant, whether by direct statement or inference. State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987); State v. Rafay, 168 Wn. App. 734, 805, 285 P.3d 83, (2012), review denied, 176 Wn.2d 1023, 299 P.3d 1171 (2013). Such testimony invades the

province of the jury and constitutes manifest constitutional error if it is an explicit or nearly explicit opinion on guilt. Kirkman, 159 Wn.2d at 927-28, 936. Testimony describing a defendant's demeanor, on the other hand, is not opinion and is admissible if relevant. State v. Day, 51 Wn. App. 544, 552, 754 P.2d 1021 (1988). To determine whether testimony amounts to improper opinion testimony, we may consider the type of witness, the nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact. Kirkman, 159 Wn.2d at 928.

Detective Sevaaetasi's testimony was neither an opinion nor an opinion on Contreras' guilt. He testified that after he read Contreras and Ho their rights, they asked "why they were there" and denied any knowledge of the crime. The detective described them as "indifferent" and "nonchalant" but said that attitude was "not at all unusual." When asked to explain this description further, he said that arrestees normally make "some protestation about guilt or innocence or whatever or why they're there. There was no such attitude from them. They were -- really kind of indifferent, just sat there." Id. (emphasis added). This testimony did not convey the Detective's opinion; rather, it described what he observed.

And, even if the Detective's testimony could be characterized as an opinion, it was not an explicit or nearly explicit opinion on Contreras's guilt. While the detective compared Contreras's demeanor to the typical reaction of an arrestee, he did not purport to distinguish between the behaviors of guilty and innocent arrestees. Rather, he simply testified that arrestees, whether guilty or

not, typically make "protestation[s]" about their "<u>guilt or innocence or whatever</u> or why they're there." (Emphasis added.) The detective testified that Contreras and Ho did in fact claim their innocence and ask why they were there, but they did so in a "nonchalant" manner. The detective never suggested that Contreras's nonchalance indicated guilt and even said it was "not at all unusual." In context, the Detective's testimony was an observation regarding Contreras's relative comfort with police interaction, not an opinion on guilt. Cf. <u>State v. Rafay</u>, 168 Wn. App. at 808 (When viewed in context, testimony that defendant appeared "robotic" would likely have been viewed by the jury "as a reference to the defendants' behavior rather than as an indirect opinion on guilt or veracity.").

In short, the detective's testimony was neither an explicit nor nearly explicit opinion on guilt warranting review for the first time on appeal. It was therefore not manifest constitutional error.

## II.   Comment on Silence

For similar reasons, Contreras's argument that Detective Sevaaetasi commented on his silence cannot be raised for the first time on appeal. A police witness may not testify in a manner that implies guilt from a defendant's silence or refusal to answer questions. <u>State v. Lewis</u>, 130 Wn.2d 700, 705, 927 P.2d 235 (1996). To do so violates the defendant's Fifth Amendment right to refrain from self-incrimination. <u>State v. Easter</u>, 130 Wn.2d 228, 241-42, 922 P.2d 1285 (1996). But, when a defendant talks to investigators, a police witness may comment on what he does or does not say. <u>State v. Clark</u>, 143 Wn.2d 731, 765,

24 P.3d 1006 (2001). And, comments on a defendant's demeanor, as opposed to silence, are proper. State v. Barry, 183 Wn.2d 297, 308, 352 P.3d 161 (2015).

As noted above, Contreras did not invoke his right to remain silent. Rather, he spoke to police and denied any knowledge of the incident. When asked where he was on the evening in question he said, " 'I don't remember. I don't know.' " In these circumstances, Detective Sevaaetasi's testimony that Contreras acted nonchalantly and without the typical level of concern for his situation was not a comment on silence or manifest constitutional error. See State v. Curtiss, 161 Wn. App. 673, 692, 250 P.3d 496 (2011) (where defendant did not invoke right to remain silent and spoke to police, detective's testimony that the defendant did not react to or deny his accusations was not improper comment on silence).[3]

---

[3] The cases cited by Contreras are distinguishable because they involved direct comments on protected silence (as opposed to the defendant's attitude after choosing to speak to police), use of the improper testimony in closing argument, and the absence of testimony that the defendant's conduct was not unusual. See State v. Holmes, 122 Wn. App. 438, 442, 446, 93 P.3d 212 (2004) (testimony that Holmes " '[d]idn't appear surprised" at the moment of arrest and that " 'there wasn't any kind of denial or something that I would normally expect to see' " when he was advised of the charge was "a direct comment on Holmes' failure to deny the charges immediately upon being confronted with them" that was compounded by use of comment in closing argument); State v. Pinson, 183 Wn. App. 411, 414-15, 333 P.3d 528 (2014) (testimony regarding Pinson's silence in response to a specific question from police was direct comment on silence that prosecutor exploited by arguing that the silence was "evidence of his guilt."); United States v. Velarde-Gomez, 269 F.3d 1023, 1031 (2001) (testimony that, when told of drugs found in his car's gas tank, defendant " 'didn't look surprised or upset,' " said nothing, and did not deny knowledge of drugs was a comment on pre-Miranda silence, not a comment on demeanor, as "[t]here was no outward physical manifestation to comment upon other than Velarde's 'state or condition of silence.'").

Even if Contreras could demonstrate manifest constitutional error, he cannot show actual prejudice. An alleged error is "manifest" only if there is a showing of actual prejudice—i.e., a " 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.' " Kirkman, 159 Wn.2d at 935 (internal quotation marks omitted) (quoting State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). Any impropriety in the detective's testimony was indirect, isolated, and not repeated in closing argument. There was no actual prejudice.

Contreras's alternative claim of ineffective assistance of counsel fails for essentially the same reason. A defendant claiming ineffective assistance must demonstrate both deficient performance and prejudice—i.e., a reasonable probability that the outcome would have been different but for counsel's omission. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). For the reasons discussed above, there is no reasonable probability that the outcome would have been different had trial counsel objected to the challenged testimony.

III.   Jury Unanimity

Contreras next contends he was denied his right to a unanimous jury. Noting that the evidence showed two shooting locations, he argues that either the State had to elect one location for the jury to consider or the court had to give the jury a unanimity instruction. The State responds, and we agree, that neither an election nor an instruction was required because the shootings were a continuing course of conduct.

When the State presents evidence that the defendant committed two or more acts, any one of which could constitute the crime charged, the State either must elect one act or the jury must be instructed that it must unanimously agree on a single act. State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), overruled on other grounds, State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). No election or unanimity instruction is required, however, if the defendant's acts were part of a " 'continuing course of conduct.' " State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting Petrich, 101 Wn.2d at 571). Whether two or more acts are a " 'continu[ous] course of conduct' " is determined in a commonsense manner. Id. (quoting Petrich, 101 Wn.2d at 571). Among the considerations are whether the acts occurred at different times or places, whether they involved the same victim, and whether the defendant intended to secure the same objective in each act. State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995). Generally, where the defendant engages in a series of actions intended to achieve a singular objective, the evidence establishes a continuing course of conduct. Id.

The shootings in this case were relatively close together in time, involved the same victims, and occurred during a single, continuous pursuit involving the same vehicles and objective. Viewed in a commonsense manner, the shootings were a continuing course of conduct.

IV.   Prosecutorial Misconduct

Contreras also claims the prosecutor committed misconduct during closing argument. He contends the prosecutor improperly vouched for West's credibility

by saying, " 'We only know for certain two of the individuals that were shooting that night. That was Mr. Contreras and Mr. Ho.' " (Emphasis added.) A prosecutor's use of the word "we" in this context amounts to vouching only if it places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. State v. Robinson, No. 71929-7-I, slip op. at 19-20 (Wash. Ct. App. Aug. 31, 2015). Vouching will not be found prejudicial unless it is clear and unmistakable that the prosecutor was expressing a personal opinion. State v. Warren, 165 Wash.2d 17, 30, 195 P.3d 940 (2008); State v. Brett, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). In addition, when, as here, the defense does not object to alleged misconduct at trial, reversal is required only if the misconduct was so flagrant and ill-intentioned as to be incurable. State v. Belgarde, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

Viewed in context, the challenged remark did not clearly or unmistakably put the prestige of the government behind West's testimony or suggest that information to which the jury was not privy supported that testimony. Rather, the words "we only know" marshalled the evidence actually admitted at trial. See Robinson, slip op. at 19-20 (concluding that the prosecutor's use of "we know" in closing was simply to marshal evidence and inferences therefrom). Furthermore, any impropriety in this isolated remark cannot be characterized as flagrant, ill-intentioned, or incurable.

Contreras also contends the prosecutor disparaged defense counsel, and thereby committed misconduct, when she told the jury that defense counsel had

"gone through in their closing and tried to explain away or dismiss every single piece of the State's evidence. But it gets to a point where you lose -- where it becomes nonsensical." This was not misconduct.

It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity. State v. Thorgerson, 172 Wash.2d 438, 451, 258 P.3d 43 (2011). It is not improper, however, to argue that the evidence does not support the defense theories or to comment critically on a defense argument so long as the comment does not disparage counsel's role or integrity. See generally Thorgerson, 172 Wn.2d at 451-52 (referring to defense arguments as " 'bogus' " or involving " 'sleight of hand' " impugns defense counsel because such language implies deception); Warren, 165 Wn .2d at 29-30 (prosecutor disparaged role of defense counsel by calling defense argument a " 'classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are doing' ."); State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997) (prosecutor's remark that defense claim was " 'ludicrous' " was a fair characterization of the defense theory). The challenged remarks in this case focused on the validity of defense counsel's arguments and did not directly or indirectly impugn defense counsel's role or integrity.

Finally, Contreras argues that the court erred in failing to enter written CrR 3.5 findings and conclusions and that we must remand for their entry. The trial court belatedly entered the findings and conclusions, however, and Contreras has not alleged any prejudice from their delayed entry. Accordingly, he fails to

demonstrate grounds for relief. <u>State v. Gaddy</u>, 114 Wn. App. 702, 704-05, 60 P.3d 116 (2002), <u>aff'd</u>, 152 Wn.2d 64, 93 P.3d 872 (2004) ("[W]e will not reverse a conviction for tardy entry of findings unless the defendant can establish either that [he] was prejudiced by the delay or that the findings and conclusions were tailored to meet the issues presented in [his] appellate brief.").

Because Contreras fails to demonstrate any error, his cumulative error argument also fails.

Affirmed.

WE CONCUR: