**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 16, 2023

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 16, 2023

_E._
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 100894-5 |
| Respondent, | EN BANC |
| v. | |
| J.W.M., | Filed <u>February 16, 2023</u> |
| Petitioner. | |

STEPHENS, J.—When J.W.M. was 17½ years old, he pointed what he thought was an unloaded gun at his friend W.B. and pulled the trigger. The gun was loaded and it discharged. W.B. died two days later. The State charged J.W.M. with first degree manslaughter while being armed with a firearm and unlawful possession of a firearm (UPFA). Because first degree manslaughter is a serious violent offense subject to the "auto-decline" statute, RCW 13.04.030(1)(e)(v)(A), J.W.M. was tried in adult court. A jury found him guilty of second degree manslaughter, a lesser included offense; and the court found him guilty of UPFA in a bifurcated bench trial. With neither offense being an auto-decline offense, J.W.M. was not sentenced in adult court but instead proceeded to a juvenile disposition hearing. More than two weeks before the disposition hearing, the State—for the first time—recommended a

manifest injustice disposition. The juvenile court imposed the maximum possible manifest injustice upward disposition: confinement until age 25.

J.W.M. challenges his disposition on several grounds, including that the juvenile court's primary reason for imposing the disposition was J.W.M.'s need for treatment and services—an invalid basis under our decision in *State v. B.O.J.*, 194 Wn.2d 314, 449 P.3d 1006 (2019). We agree that a new disposition hearing is required, as a manifest injustice disposition is not justified by a juvenile offender's need for services. To provide guidance to the lower court on remand, we address additional issues raised by J.W.M. We clarify the relevant factors a juvenile court may consider when making a manifest injustice determination and hold that the court below erred to the extent that it considered charged but unproven conduct that J.W.M. did not admit to committing. We also interpret RCW 13.40.300(2) to authorize a manifest injustice disposition up to age 25 in cases when a juvenile at the age of 16 or 17 commits a violent offense while armed with a firearm. We decline to address J.W.M.'s belated due process notice claim because he has not shown manifest constitutional error that can be addressed for the first time on appeal. Our decisions in *State v. M.S.*, 197 Wn.2d 453, 484 P.3d 1231 (2021), and *State v. D.L.*, 197 Wn.2d 509, 484 P.3d 448 (2021), do not provide a constitutional right to pretrial notice in adult court of a manifest injustice disposition the State might later

*State v. J.W.M.*, No. 100894-5

seek in juvenile court. Nor has J.W.M. demonstrated actual prejudice making any constitutional error "manifest" for purposes of review under RAP 2.5(a)(3).

FACTS AND PROCEDURAL HISTORY

*Background Facts and Trial*

On July 8, 2018, J.W.M. and two of his friends were hanging out and "[taking] pictures with each other holding and posing with firearms." Clerk's Papers (CP) at 360. At some point during the day, J.W.M. had aimed one of the firearms at each friend, pulling the trigger each time he aimed. The gun never fired. Both friends admonished J.W.M. for his actions and told him not to point the gun at them again. But later that evening, J.W.M. pointed the firearm at his friend W.B. and again pulled the trigger. This time the gun fired. The bullet struck W.B. in the head and he died two days later. At the time of the shooting, J.W.M. was 17½ years old. The State charged J.W.M. with first degree manslaughter while being armed with a firearm and UPFA. The manslaughter charge resulted in an automatic decline of juvenile court jurisdiction. RCW 13.04.030(1)(e)(v)(A).

Following unsuccessful plea negotiations and nearly three years of COVID-19-related trial delays, J.W.M. proceeded to a jury trial on the first degree manslaughter charge.[1] During trial, J.W.M. asked the court to instruct the jury on

---

[1] Over J.W.M.'s objection, the State put into the appellate record a series of e-mails showing J.W.M. offered to plead guilty as charged (manslaughter 1) if the State would

*State v. J.W.M.*, No. 100894-5

the lesser included offense of second degree manslaughter. The jury deliberated for two days and found him guilty of second degree manslaughter. In a special verdict, the jury also found that J.W.M. was armed with a firearm during the commission of the crime. In a separate bench trial, the trial court found J.W.M. guilty of UPFA. Neither second degree manslaughter nor UPFA is subject to automatic adult court jurisdiction, and the case returned to juvenile court for a disposition hearing under the Juvenile Justice Act of 1977 (JJA), ch. 13.40 RCW.

*Manifest Injustice Disposition*

In its sentencing memorandum filed 16 days before the disposition hearing, the State recommended a manifest injustice disposition upward with maximum confinement until age 25 pursuant to RCW 13.40.300(2). It primarily based this recommendation on J.W.M.'s criminal history, which includes prior adjudications for first degree robbery and residential burglary. J.W.M. committed the residential burglary while on electric home monitoring (EHM) awaiting his disposition hearing for the robbery charge. He pleaded guilty to both charges and was committed to the Juvenile Rehabilitation Administration (JRA) for 103 to 129 weeks for the robbery and a consecutive 30 days for the residential burglary. JRA released him on March 12, 2018. In May of that year, J.W.M. was charged with second degree robbery and

---

remand to juvenile court where he would agree to a manifest injustice disposition to age 25.

4

*State v. J.W.M.*, No. 100894-5

intimidating a witness. At the time the parties filed their briefings with this court, these charges were still pending. In early July 2018, J.W.M. was also charged with felony harassment and second degree assault, based on two separate incidents in June 2018. He was on EHM for the second degree assault charge when he shot W.B. J.W.M. entered into plea agreements in December 2019 for the felony harassment (reduced to gross misdemeanor harassment) and second degree assault (reduced to fourth degree assault). Along with citing J.W.M.'s criminal history, the State cited his history of aggression and substance abuse in support of its manifest injustice recommendation.

In response to the State's recommendation, J.W.M. argued the maximum age a court can commit a juvenile to JRA under RCW 13.40.300(2) is age 22—the age 21 maximum found in RCW 13.40.300(1) plus 12 months to effectuate the mandatory 12-month firearm enhancement. J.W.M. also argued against a manifest injustice disposition based on mitigating evidence of his traumatic childhood. J.W.M. had immigrated to the United States from Kenya when he was 13 years old after the Mungiki, a criminal organization in Kenya, subjected his family to violence. The Mungiki are "known for extortion, brutal violence, and hundreds of murders," and they harassed J.W.M.'s family because of his uncle's involvement in the organization. CP at 49. This violence forced his family to move to a refugee camp when J.W.M. was around 7 years old. He experienced violence firsthand. At the

5

age of 8, for example, J.W.M. found a dead man tied up in a sack in a field. He also witnessed the killing of his uncle and another person. Two forensic neuropsychologists diagnosed J.W.M. with ADHD (attention deficit hyperactivity disorder) and PTSD (posttraumatic stress disorder) because of his traumatic past. He presented these diagnoses as mitigating evidence at the disposition hearing.

The juvenile court agreed with the State's recommendation and imposed a manifest injustice disposition of confinement until age 25. It determined the standard range would constitute a manifest injustice for three reasons. The court first cited J.W.M.'s criminal history and other "continuing, uncharged and dismissed criminal conduct" not included in his criminal history. CP at 33 (Conclusion of Law (CL) 3(a)). It concluded that J.W.M.'s prior offenses were "of a similar nature to this offense" and, given that he committed some offenses while other cases were pending, he failed "to comply with court orders." *Id.* Second, the court found J.W.M. showed "no regard for the property or safety of others" because of the nature of his crimes (e.g., stealing, inflicting harm on victim while stealing, shooting another in the head). *Id.* (CL 3(c)). Third, the court stated that the standard range would be too lenient because J.W.M. had "already served a significant amount of time at JRA for prior offenses yet continues to offend." *Id.* (CL 3(d)). Notably, the court relied on J.W.M.'s PTSD, ADHD, and substance use disorder to lengthen his term of confinement, determining that he would need further treatment and

*State v. J.W.M.*, No. 100894-5

"[w]ithout such treatment and counseling, the respondent would pose a real danger to the community." *Id.* (CL 3(b)).

*Procedural History of Appeal*

J.W.M. timely moved for accelerated review in Division One of the Court of Appeals. He raised four claims challenging his manifest injustice disposition. First, he argued that our decisions in *M.S.*, 197 Wn.2d 453, and *D.L.*, 197 Wn.2d 509, require that the State provide pretrial notice in adult court of its intent to seek a manifest injustice disposition in juvenile court, as well as notice of the factual basis supporting this disposition. J.W.M. claimed the State's failure to provide such notice violated his due process rights. Second, he argued the juvenile court acted inconsistent with *B.O.J.*, 194 Wn.2d 314, because it impermissibly relied on J.W.M.'s need for treatment as a basis for imposing the manifest injustice disposition. Relatedly, he argued the court improperly (1) based its decision on its disagreement with the standard sentence range, (2) considered gross misdemeanor convictions that had been included in J.W.M.'s criminal history, (3) relied on charged but unproven conduct, (4) considered charged conduct that resulted in a plea to lesser charges, and (5) failed to weigh mitigating factors. Finally, J.W.M. argued that RCW 13.40.300(2) did not authorize the court to impose a manifest injustice disposition up to age 25 but instead only up to age 22.

7

The Court of Appeals' commissioner accepted J.W.M.'s motion for accelerated review and upheld J.W.M.'s disposition. The commissioner first determined that the notice principles articulated in *D.L.* and *M.S.* were inapplicable to the unique procedural posture of this case. Next, the commissioner rejected J.W.M.'s argument regarding treatment needs because, unlike in *B.O.J.*, the juvenile court's manifest injustice determination linked J.W.M.'s treatment needs to a serious and clear danger to society. The commissioner also concluded that the juvenile court did not abuse its discretion by considering improper aggravating factors. Finally, the commissioner concluded that the plain language of RCW 13.40.300(2) authorized the court to commit J.W.M. to JRA until age 25. J.W.M. moved to modify the commissioner's ruling and a panel of the Court of Appeals, Division One denied the motion.

J.W.M. then moved for discretionary review in this court, which we accepted.[2]

ANALYSIS

The outcome-determinative issue in this case is the juvenile court's improper reliance on J.W.M.'s need for services as a basis for imposing a manifest injustice disposition up to age 25. Because the juvenile court consistently stated this was its

---

[2] Over the State's objection, we accepted amici briefing in support of J.W.M. from the Fred T. Korematsu Center for Law and Equality joined by the American Civil Liberties Union of Washington, Choose 180, Creative Justice, King County Department of Public Defense, and TeamChild.

main reason for imposing the disposition, and because the record does not reflect

that J.W.M.'s untreated needs pose a serious and clear danger to society, we hold

that the court erred, reverse J.W.M.'s disposition, and remand for a new disposition

hearing.

To provide guidance on remand, we address additional arguments and

conclude that the juvenile court erred in its manifest injustice determination to the

extent that it considered charged but unproven conduct that J.W.M. did not admit to

committing. We also find that the plain language of RCW 13.40.300(2) authorizes

a juvenile court to impose a manifest injustice upward with release at age 25 for the

offenses J.W.M. committed. We decline to address J.W.M.'s due process notice

claim because it was not raised below and J.W.M. has not identified manifest

constitutional error to warrant consideration on the merits under RAP 2.5(a)(3).[3]

---

[3] We reject the State's argument that J.W.M. invited any error in his manifest injustice disposition because he asked for a disposition 38 weeks above the standard range. This is not a fair characterization of J.W.M.'s request. At the hearing, J.W.M. stated that if the juvenile court did impose a manifest injustice disposition, as requested by the State, then the court should release J.W.M. for time served because COVID-19-related trial delays had caused him to be held for 38 weeks beyond the high end of the standard range for his offense. Requesting a sentence of time served, even when it exceeds the standard range, is not the type of affirmative act that constitutes invited error. *In re Pers. Restraint of Call*, 144 Wn.2d 315, 328, 28 P.3d 709 (2001) (A party invites error when it takes an affirmative, voluntary action to set up the error.).

We also reject the State's argument that J.W.M. waived his challenge to the manifest injustice disposition by not objecting in juvenile court and that his failure to object below requires us to treat the juvenile court's findings of fact as verities on appeal. RCW 13.40.230 contemplates that an appellate court will address challenges to a juvenile court's exercise of discretion in imposing a manifest injustice disposition on a motion for accelerated review. RCW 13.40.230(2) (setting out factors appellate courts must consider

*State v. J.W.M.*, No. 100894-5

I.    The Juvenile Court Improperly Based J.W.M.'s Manifest Injustice Disposition on His Need for Treatment and Failed To Demonstrate That His Untreated Needs Posed a "Serious, and Clear Danger to Society"

J.W.M. argues we should reverse his disposition because, contrary to our holding in *B.O.J.*, 194 Wn.2d 314, the juvenile court primarily based its manifest injustice determination on J.W.M.'s treatment needs. He contends that although the court asserted that without treatment he posed a "serious, and clear danger to society" under RCW 13.40.020(20), the record does not reveal such a connection as required by *B.O.J.* We agree with J.W.M., reverse his disposition on this basis, and remand for a new disposition hearing.

We review a juvenile court's decision to impose a manifest injustice disposition for abuse of discretion. *B.O.J.*, 194 Wn.2d at 322. On review, we ask three questions: (1) whether "the reasons supplied by the disposition judge are supported by the record which was before the judge," (2) whether "those reasons clearly and convincingly support the conclusion that a disposition within the range would constitute a manifest injustice," and (3) whether "the sentence imposed was neither clearly excessive nor clearly too lenient." *State v. M.L.*, 134 Wn.2d 657, 660, 952 P.2d 187 (1998) (citing RCW 13.40.230(2)). Before a court can impose a

---

"[t]o uphold a disposition outside the standard range"). This is not to say that all due process or other constitutional claims can be raised for the first time under this statute (and we address below whether J.W.M.'s notice argument demonstrates manifest constitutional error under RAP 2.5(a)). As to J.W.M.'s claims that the juvenile court abused its discretion, he properly challenged his manifest injustice disposition by timely filing a motion for accelerated review pursuant to RCW 13.40.230 and RAP 18.13.

10

*State v. J.W.M.*, No. 100894-5

manifest injustice disposition, it must determine whether a disposition within the standard range would constitute a "serious, and clear danger to society in light of the purposes of [the JJA]." RCW 13.40.020(20). A juvenile court must consider certain mitigating and aggravating statutory factors and may also consider certain nonstatutory factors when making this determination. *M.S.*, 197 Wn.2d at 470-71.

"Once a juvenile court has concluded that a disposition within the standard range would effectuate a manifest injustice, the court is vested with broad discretion in determining the appropriate sentence to impose." *M.L.*, 134 Wn.2d at 660. Abuse of discretion occurs if the "ruling is based on an erroneous view of the law or involves application of an incorrect legal analysis." *B.O.J.*, 194 Wn.2d at 322-23 (citing *Dix v. ICT Grp., Inc.*, 160 Wn.2d 826, 833, 161 P.3d 1016 (2007); *State v. Kinneman*, 155 Wn.2d 272, 289, 119 P.3d 350 (2005)). If a juvenile court bases a manifest injustice disposition on both valid and invalid factors, remand is necessary when the court "'places significant weight on an inappropriate factor.'" *State v. Post*, 118 Wn.2d 596, 616, 826 P.2d 172 (1992) (quoting *State v. Pryor*, 115 Wn.2d 445, 456, 799 P.2d 244 (1990), *overruled in part on other grounds by State v. Ritchie*, 126 Wn.2d 388, 395, 894 P.2d 1308 (1995)); *see also B.O.J.*, 194 Wn.2d at 329 ("The particular facts of this record fail to convince us that the trial court would have imposed a manifest injustice disposition in the absence of B.O.J.'s treatment needs."). On remand, a trial court can still "impose a manifest injustice based on

11

*State v. J.W.M.*, No. 100894-5

appropriate factors . . . provided that it found by clear and convincing evidence, and entered reasons for its finding, that a disposition outside the standard range would effectuate a manifest injustice." *B.O.J.*, 194 Wn.2d at 331 (citing RCW 13.40.160(2); *State v. T.J.S.-M.*, 193 Wn.2d 450, 458-62, 441 P.3d 1181 (2019)).

A. *B.O.J.* Prohibits a Manifest Injustice Disposition Based on a Juvenile's Need for Treatment Except When the Juvenile Will Pose a Serious and Clear Danger to Society without Services or Treatment

In *State v. B.O.J.*, we determined the juvenile court abused its discretion by imposing a manifest injustice disposition based on the juvenile's need for services. *Id.* at 327. There, the juvenile court identified two grounds for imposing a manifest injustice disposition. First, it concluded B.O.J. could not complete the services she needed through JRA within the time frame of the standard range and she would not seek services in the community. *Id.* at 319. Second, it found the standard range would be too lenient because of B.O.J.'s criminal conduct, dismissed charges, and failure to comply with court orders. *Id.*

We held the court erred when it considered B.O.J.'s need for services because treatment "typically does not implicate a serious and clear danger to society." *Id.* at 327. Rather, the need for treatment "is typically relevant only to the trial court's determination of what form and length of manifest injustice disposition to impose— not to the threshold determination of whether a manifest injustice disposition is appropriate." *Id.* at 331 (citing RCW 13.40.010(2)(g)). Put differently, a juvenile

court can consider a juvenile's treatment needs in its threshold manifest injustice determination only when an untreated need would impose a serious and clear danger to society. In *B.O.J.*, the juvenile court failed to demonstrate how B.O.J.'s treatment needs posed a serious and clear danger to society. As we explained, the record in that case

> [did] not indicate, for example, that the State sought mental health treatment services to prevent B.O.J. from harming other members of society. Instead, the record indicate[d] that B.O.J. would benefit from counseling to address the substantial trauma of her unstable home life and experiences as a transient youth. And the record fail[ed] to indicate that her history of alcohol and marijuana use, while personally harmful, imposed a serious and clear danger to society.

*Id.* at 326.

Our disapproval of the court's disposition in *B.O.J.* suggests that a juvenile court must engage in a two-step analysis before imposing a manifest injustice disposition in the rare cases when a juvenile's untreated needs would pose a serious and clear danger to society. First, the court must state with particularity the serious and clear danger the juvenile's untreated and unaddressed need would pose to society. Second, it must identify how a particular treatment or service would prevent that serious and clear danger. Broad assertions of potential danger and treatment needs will not suffice. Likewise, we believe *B.O.J.* requires a similar level of specificity when a court considers a juvenile's need for treatment or services in setting the form and length of the disposition. For example, the court must state with

*State v. J.W.M.*, No. 100894-5

particularity the needed treatment or service, the length of the program, and why the treatment or service is needed. The court must tailor the length and form of the disposition to the identified treatment and service needs of the juvenile.

In *B.O.J.*, we also considered whether the juvenile court's second reason for imposing a manifest injustice disposition—the standard range would be too lenient—could nonetheless support the court's manifest injustice determination despite its improper consideration of treatment needs. Generally, "leniency of the standard range is an appropriate basis for imposing a manifest injustice disposition above the standard range." *Id.* at 328. However, we were not convinced the court would have imposed the same manifest injustice disposition absent B.O.J.'s treatment needs because the court "focused almost exclusively on B.O.J.'s treatment needs as the basis for imposing a manifest injustice disposition." *Id.* at 329. For example, the juvenile court opined:

> "[I]f I'm given two choices, one being her on the street and hoping for the best, and one being her in a place where she's stable and has access to treatment . . . at some point during that period of time, hopefully she realizes . . . that there are things out there that can help her . . . [The] JRA in this state is not designed to warehouse people . . . it's designed to offer services in a place where you, [B.O.J.], weren't able to get them before."

*Id.* at 320 (most alterations in original) (quoting court papers); *see also id.* at 319-20 (juvenile court's reason for imposing the disposition was "'not so much the seriousness of [B.O.J.'s] adjudications, but the seriousness of the services that she

14

*State v. J.W.M.*, No. 100894-5

needs in order to have success'" (quoting court papers)). Because the juvenile court placed significant weight on B.O.J.'s treatment needs in its manifest injustice determination, we were left with "the indelible impression that the trial court's finding of manifest injustice was motivated almost exclusively by B.O.J.'s treatment needs." *Id.* at 330.

In sum, *B.O.J.* instructs two things. First, a court must base manifest injustice dispositions on juvenile offenders' serious and clear danger to society, not on their need for treatment services at JRA. Any consideration of treatment must be tailored to the juvenile offender's specific risk. Second, a juvenile court abuses its discretion when the record does not demonstrate that the juvenile court would have imposed the same manifest injustice disposition absent its improper reliance on the juvenile's need for services.

This two-step analysis is important to assure that juvenile manifest injustice dispositions properly rest on public safety considerations and not on improper factors such as racial bias. J.W.M. and amici rightly point out how racial bias can impact sentencing decisions. *See* J.W.M. Reply to State's Resp. to Mot. for Discr. Rev. at 10-11 (noting, "courts are more likely to perceive Black children as dangerous and impose harsher punishments" (citing Laura Beckman & Nancy Rodriguez, *Race, Ethnicity, and Official Perceptions in the Juvenile Justice System: Extending the Role of Negative Attributional Stereotypes*, 48 CRIM. JUST. & BEHAV.

15

*State v. J.W.M.*, No. 100894-5

1536, 1540, 1550 (2021); Kristin Henning, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform*, 98 CORNELL L. REV. 383, 415-26 (2013))); *see also* Am. Br. of Amici Curiae Fred T. Korematsu Ctr. for L. & Equal. et al. at 4 ("Youth of color are less likely to receive a diversion relative to white youth, and Black youth are convicted at a rate 4.8 times the rate of white children." (citing TASK FORCE 2.0 RACE & CRIM. JUST. SYS., REPORT AND RECOMMENDATIONS TO ADDRESS RACE IN WASHINGTON'S JUVENILE LEGAL SYSTEM: 2021 REPORT TO THE WASHINGTON SUPREME COURT 13 (2021),

https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=1118&context
=korematsu_center [https://perma.cc/93Y8-D5U5])). By requiring courts to demonstrate a specific and detailed connection between a juvenile offender's treatment needs and a manifest injustice determination, *B.O.J.* helps to mitigate the risk that racial bias will result in harsher sentencing for youth of color.[4]

---

[4] Amici urge us to adopt two new nonstatutory factors that a juvenile court must consider when imposing a manifest injustice disposition. First they propose juvenile courts must "explicitly consider adultification bias on the record when sentencing young people of color . . . ." Am. Br. Amici Curiae at 33; *see also id.* at 15-16 (discussing how statutory mitigating and aggravating factors of a manifest injustice disposition can "invite 'subjective judgments' influenced by adultification bias"). Second, they propose juvenile courts must expressly consider the harmful effects of incarceration on young people. *Id.* at 20; *see also id.* at 22-26 (harms of incarceration). While these are certainly important considerations in juvenile sentencing, we decline to adopt a new legal standard in this case because the issue is raised only by amici. *See Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 827, 854 P.2d 1072 (1993).

16

Applying the teachings of *B.O.J.*, we must ask whether the juvenile court, in considering J.W.M.'s need for treatment, failed to identify how his untreated needs would pose a "serious, and clear danger to society" as required by the statute. RCW 13.40.020(20). If the answer is yes, then the manifest injustice disposition is improper unless it is clear from the record that the court would have imposed the same disposition based on other factors absent its reliance on treatment.

B. The Juvenile Court Abused Its Discretion by Placing Significant Weight on J.W.M.'s Treatment Needs When the Record Failed To Demonstrate He Posed a Serious and Clear Danger to Society without Treatment

J.W.M. argues his disposition must be reversed in light of *B.O.J.* because the juvenile court's primary reason for imposing his disposition was his need for services. He also claims the court failed to demonstrate why his need for treatment created a serious and clear danger to society. We agree and hold the juvenile court abused its discretion by placing significant weight on J.W.M.'s treatment needs when it made its manifest injustice determination and by failing to link those needs to a serious and clear danger to society as required by *B.O.J.*

As to the first step in our analysis, the juvenile court candidly admitted that J.W.M.'s need for services was its primary reason for the manifest injustice disposition:

> [PROSECUTION]: So, I understand that Court's primary finding is— the basis is the need for—
>
> THE COURT: Services.

17

*State v. J.W.M.*, No. 100894-5

[PROSECUTION]:  I'm sorry?

THE COURT:  The need for services, and criminal history.

Verbatim Tr. of Proc. (VTP) at 49; *see also id.* at 42 ("I believe that what [J.W.M.] needs is services.  He needs treatment; he needs to have his PTSD addressed, he needs to have his ADHD addressed, he needs to have his substance abuse addressed.").  The written conclusions of law also highlight the court's emphasis on treatment:

> [J.W.M.'s] mental health challenges (PTSD and ADHD) and substance abuse issues will require more treatment and counseling than can be accomplished during the standard range sentence.  Without such treatment and counseling, [J.W.M.] would pose a real danger to the community.  This is a basis to depart upward from the standard range.

CP at 33 (CL 3(b)).  *B.O.J.* instructs against this type of decision-making: the benefits a juvenile might receive though JRA services and treatment cannot support a manifest injustice determination.  194 Wn.2d at 326.  Courts do not incarcerate children because it is good for them.  The court here improperly focused on the perceived personal benefits J.W.M. would receive from JRA treatment in order to support its manifest injustice disposition.

We can understand why the court wanted J.W.M. to receive the treatment and services he needed, particularly in light of his history of serious childhood trauma.  We also recognize that juvenile courts must often make difficult decisions when balancing the JJA's varying interests and purposes. *See* RCW 13.40.010.  However, *B.O.J.* recognized that using incarceration as a means of treatment is not appropriate.

18

*State v. J.W.M.*, No. 100894-5

194 Wn.2d at 327-28 ("[T]he studies cited by B.O.J. and amici offer a cautionary tale against imposing lengthy sentences over standard range dispositions with the hope of improving outcomes for juvenile defendants."). Indeed, under the JJA, incarceration beyond the standard range must relate to the juvenile's *risk* to society, not to his or her treatment needs. *Id.* at 326 ("[T]he Act's purposes are relevant to the trial court's threshold manifest injustice finding only to the extent that they speak to 'a serious, and clear danger to society.'" (quoting former RCW 13.40.020(19) (2019), *recodified as* RCW 13.40.020(20)).

The court below assumed, without proving, that J.W.M. could receive services only within JRA. *See, e.g.*, CP at 31 (Finding of Fact (FF) 7) ("The respondent has shown by his prior behavior that he will not succeed in necessary mental health and substance abuse treatment in the community."). But the record does not support this conclusion. At the disposition hearing, Mr. Sinclair from Community Passageways expressed his commitment to help J.W.M. integrate into the community and to find J.W.M. services to meet his needs. Dr. Judd, a neuropsychologist who interviewed J.W.M., reported that J.W.M.'s pastor, Esther Ndungu, felt that J.W.M. could be a "very positive leader in their community" and that he did well when engaged with the church. *Id.* at 46. J.W.M. also expressed his desire to reenter the community and build a better life for himself:

> I know I'm capable of changing. . . .

19

*State v. J.W.M.*, No. 100894-5

> I don't want to be incarcerated, I don't want to end up dead. I
> want to get out, be a better dad to my son, be there for my family, for
> my little niece; and just give back to every—and just anything I can do
> to turn these negative situations into positive[s].

VTP at 35. The juvenile court appeared to disregard these support systems, or at

least minimized their importance, in finding that J.W.M. could not receive services

outside of JRA.

In short, the record in this case demonstrates that the juvenile court placed

significant weight on J.W.M.'s need for services and treatment. To determine

whether the manifest injustice disposition complied with *B.O.J.*, we must therefore

assess whether the juvenile court identified that J.W.M.'s need for treatment and

services creates a serious and clear danger to society.

Several times during the disposition hearing, the court asserted J.W.M.'s

untreated needs would pose a public safety risk. For example, it stated that without

services from JRA, "[t]here is absolutely nothing to guarantee public safety, or that

there will be any change in him to stop this from happening again." *Id.* at 43.

Similarly, the written findings alleged that "[r]eleasing [J.W.M.] into the community

without any further treatment or services provided by JRA would impose a clear

danger to the community." CP at 32 (FF 16). But the court failed to explain the

basis for this broad statement. A review of the record reveals that J.W.M.'s specific

mental health issues and substance use disorder treatment needs likely do not meet

this risk threshold. Neither of the neuropsychologists who examined J.W.M. found

20

*State v. J.W.M.*, No. 100894-5

that his mental health struggles and substance use disorder made him a serious and clear danger to society. In fact, Dr. Neer suggested that J.W.M. posed an average safety risk. He also strongly recommended assistance from "community mental health" resources and reflected on J.W.M.'s "capacity to develop a strong therapeutic alliance with a provider." CP at 75-76.

The only place in the record possibly suggesting that J.W.M.'s untreated needs could create a serious and clear danger to society is that his former JRA treatment providers considered aggression to be a target issue. For example, the Juvenile Probation Counselor (JPC) recommended that J.W.M. "could use a refresher course on [Dialectical Behavior Therapy] skills and anger management." Sealed JPC Rep. at 15. The neuropsychologist reports also reflect J.W.M.'s struggle with frustration and anger. CP at 51 (J.W.M. experiences anger and can go "from '0 to 100' quickly and starts to punch things like the wall."); *id.* at 70 (J.W.M. experiences bouts of anxiety and agitation.). Yet the court never identified in its oral ruling or written findings that J.W.M.'s aggression issues must be addressed. Instead, as demonstrated above, the court highlighted J.W.M.'s mental health conditions (PTSD and ADHD) and his substance use disorder, never explaining how those conditions posed a serious and clear danger to society. Nor did the court identify any possible treatment in JRA to address any of the unspecified safety risk that J.W.M. may have posed. Rather, the court broadly stated only that J.W.M.

21

*State v. J.W.M.*, No. 100894-5

needed treatment and services, failing to identify what that treatment would look like.  This reasoning lacks the specificity required by *B.O.J.*, and warrants reversal of the manifest injustice disposition.

The State argues that we should uphold the disposition despite reliance on J.W.M.'s need for services because the juvenile court had other valid reasons for going above the standard range.  The court mentioned four other grounds for its manifest injustice determination: (1) the standard range would be too lenient given J.W.M.'s criminal history, (2) J.W.M. continued to reoffend while cases were pending, (3) J.W.M. has no regard for the property or safety of others, and (4) that despite having served significant time in JRA, J.W.M. continues to reoffend.  *See* RCW 13.40.150(3)(i)(iv) ("recent criminal history [and] has failed to comply with conditions of a recent dispositional order"), (vii) ("other complaints which have resulted in . . . a finding or plea of guilty but which are not included as criminal history"), (viii) (seriousness of prior adjudications); *State v. Taylor*, 42 Wn. App. 74, 709 P.2d 1207 (1985) (no regard for the property or safety of others is a valid nonstatutory aggravating factor); *State v. Meade*, 129 Wn. App. 918, 120 P.3d 975 (2005) (courts may consider whether juvenile followed court orders or continued to offend while other criminal matters were pending).

While these constitute valid grounds for imposing a manifest injustice disposition, the relevant inquiry under *B.O.J.* is whether the court would have

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. J.W.M.*, No. 100894-5

independently imposed this same manifest injustice disposition absent its improper

consideration of J.W.M.'s treatment needs. *See B.O.J.*, 194 Wn.2d at 329 (remand

appropriate if trial court would not have imposed same manifest injustice disposition

absent treatment needs); *Post*, 118 Wn.2d at 616 (remand necessary when trial court

placed "significant weight" on inappropriate factor). We are not convinced that the

juvenile court would have imposed the same disposition absent J.W.M.'s treatment

needs.

Much like the court in *B.O.J.*, the court here contextualized its other valid

grounds it considered within J.W.M.'s need for treatment. For example, the court

stated:

> So, the valid non-statutory aggravating factors that I am
> concentrating on are that he was on EHD [(electronic home detention)]
> while other matters were pending, repeatedly, or on release for the
> Assault 2, for the Res[idential] Burg[lary]; there is no regard for the
> property or safety of others; and, *if he is released, on the standard
> range, he will be out in the community, with no treatment and no hope
> of getting better*.

VTP 43 (emphasis added). We expressly rejected similar reasoning in *B.O.J.*,

finding there that the court referenced B.O.J.'s criminal history without elaboration

and "*immediately downplayed the significance of that finding to its decision*, stating,

'And I guess—let me back up—not so much the seriousness of her adjudications,

but the seriousness of the services that she needs in order to have success.'" 194

23

Wn.2d at 329 (emphasis added) (quoting court papers). In another example, the court here said to J.W.M. at the disposition hearing:

> The fact that you commit crimes every time you get out is a concern of the Court, and we need to stop that from happening.
>
> *And, so I think that additional time in JRA hopefully will get you the family counseling that you need, the substance abuse treatment, the counseling for your mental issues*, and everything else that the probation counselor made reference to, as well as Dr. Judd when he evaluated you.

VTP at 44 (emphasis added). Again, we rejected this type of reasoning in *B.O.J.*, 194 Wn.2d at 330 (criminal history could not support manifest injustice disposition when, after discussing criminal history, the trial court "exhorted B.O.J. to avail herself of the treatment opportunities in JRA confinement"). To comport with *B.O.J.*, the court here needed to establish why J.W.M.'s criminal history, the seriousness of his past offenses, and his recidivism equates to a serious and clear danger to society. It then needed to explain what services J.W.M. would need to eliminate that serious and clear danger. Rather than doing this, the court merely expressed its hope that J.W.M. would avail himself of the services provided to him while confined at a JRA facility.

In sum, as in *B.O.J.*, we are left with a record that gives "the indelible impression that the trial court's finding of manifest injustice was motivated almost exclusively by [J.W.M.'s] treatment needs." *Id.* The juvenile court candidly acknowledged that J.W.M.'s need for services was its primary reason for imposing

24

*State v. J.W.M.*, No. 100894-5

the manifest injustice disposition. While there may have been other legitimate grounds on which the court could have based a manifest injustice disposition (e.g., J.W.M.'s criminal history and his failure to follow court orders while cases were pending), the court erred by placing significant weight on J.W.M.'s treatment needs without establishing that he would impose a serious and clear danger to society if not incarcerated up to age 25.

We reverse J.W.M.'s disposition and remand for a new hearing because the juvenile court failed to comply with *B.O.J.* To provide guidance to the lower court on remand, we next address J.W.M.'s argument that the court abused its discretion by improperly considering certain aggravating factors and his claim that the court lacked statutory authority to impose a manifest injustice disposition of confinement until age 25.

II.     In Exercising Discretion to Impose a Manifest Injustice Disposition, the Juvenile Court Should Consider Only Recognized Aggravating Factors and Should Clearly Weigh Mitigating Factors

J.W.M. argues the juvenile court abused its discretion by improperly basing its manifest injustice disposition on (1) charged conduct that was unproved and not admitted by J.W.M., (2) charged conduct that resulted in a plea to lesser charges, (3) the court's disagreement with the standard range, and (4) a misunderstanding of J.W.M.'s criminal history. He also argues the court failed to weigh the mitigating

25

evidence he introduced. To provide guidance to the lower court on remand, we address each argument briefly.

We review a juvenile court's decision to impose a manifest injustice disposition for abuse of discretion. *B.O.J.*, 194 Wn.2d at 322. Discretion must be exercised in light of the governing statutes, and we review issues of statutory interpretation de novo. *Id.* at 323 (quoting *BNSF Ry. Co. v. Clark*, 192 Wn.2d 832, 837, 434 P.3d 50 (2019)). A juvenile court must consider statutory mitigating and aggravating factors when determining whether a disposition outside the standard range is appropriate. RCW 13.40.150(3)(h), (i). A court may also consider certain nonstatutory factors so long as they relate to whether a juvenile would pose a "'serious, and clear danger to society.'" *M.S.*, 197 Wn.2d at 470 (quoting former RCW 13.40.020(19)).[5]

J.W.M. argues the trial court improperly considered and relied on his pending charges for second degree robbery and intimidating a witness in determining that the standard range would be too lenient. While no appellate decision has directly addressed whether a juvenile court may consider pending charges when imposing a

---

[5] J.W.M. asserts that "[a]ny aggravating factor used to justify a manifest injustice disposition must 'relate to the crime itself.'" Mot. for Discr. Rev. at 21 (quoting *M.S.*, 197 Wn.2d at 466). However, this is incorrect because RCW 13.40.150(h) and (i) require courts to consider factors that do not relate to the adjudicated offense. *See, e.g.*, RCW 13.40.150(3)(i)(iv) (requiring the court to consider if the "respondent has a recent criminal history").

manifest injustice disposition, *State v. T.C.* is helpful. 99 Wn. App. 701, 995 P.2d 98 (2000). There, the Court of Appeals addressed whether the juvenile court, when making a manifest injustice determination, appropriately considered uncharged and unproven criminal conduct that the juvenile admitted to committing. *Id.* at 707. Finding it did, the court in *T.C.* reasoned that "[c]ourts can best effect the JJA's goal of rehabilitation if they are able to consider a juvenile's admitted crimes when imposing an appropriate disposition because a juvenile's acknowledged wrongdoing may clarify for the court the extent and nature of the problem and the rehabilitation the juvenile needs." *Id.* at 707-08. At the same time, courts violate the presumption of innocence by considering charged and unproven conduct that a juvenile has not admitted to committing. *State v. Melton*, 63 Wn. App. 63, 72, 817 P.2d 413 (1991). In line with this sound reasoning, we conclude that a juvenile court cannot consider charged but unproven offenses that a juvenile offender has not admitted to committing.

The juvenile court in this case abused its discretion by considering and relying on J.W.M.'s pending charges for second degree robbery and intimidating a witness. The court described the charges as if proved when analyzing and discussing J.W.M.'s criminal history: "The Harassment is significant to me, mainly because it happened within three weeks after he was arrested on the pending charges of Rob[bery] 2 and Intimidating a Witness; and, the Assault 4 was one week after the

27

*State v. J.W.M.*, No. 100894-5

Harassment, with the same victim." VTP at 39-40; *see also* CP at 31 (FF 10) ("During that four-month period, the respondent committed two separate offenses, harassment and fourth degree assault, and is alleged to have committed robbery in the second degree and intimidating a witness."). The State argues the court did not actually rely on the unproven crimes because it consistently acknowledged the charges were pending. But based on this record, it is difficult to conclude that the court did not rely, at least in part, on unproven charges when it determined the standard range would be too lenient. On remand, any unproven charges that J.W.M. has not admitted to should not be considered in deciding whether to impose a manifest injustice disposition.

J.W.M. next contends the court improperly considered the original charged offenses in two past plea agreements: his harassment offense (originally charged as felony harassment) and his fourth degree assault offense (originally charged as second degree assault). We disagree with J.W.M. that the court abused its discretion by considering these original charges. J.W.M. stipulated to the facts in the probable cause certificate for both offenses he pleaded to, so the same concerns that preclude consideration of unproven but admitted offenses are not applicable here. The court then referred to those stipulated facts when detailing J.W.M.'s criminal history. RCW 13.40.150(3)(i)(iv) (juvenile courts must consider recent criminal history

*State v. J.W.M.*, No. 100894-5

when making a manifest injustice determination). On remand, the court may consider these facts.

We also disagree with J.W.M.'s argument that the court abused its discretion by basing its manifest injustice determination on a disagreement with the standard range. While the court did state that it was "ironic and odd that the range on the Manslaughter 2 for a juvenile is 0 to 30 days, local; and 15 to 36 weeks in JRA for the firearm," it did not base the manifest injustice disposition on an opinion about the inadequacy of this range. VTP at 39. Instead, it recognized that sentencing ranges are the law and must "be followed, except in certain circumstances." *Id.* at 40-41. We find no error.

J.W.M. next argues the court improperly counted his fourth degree assault and harassment charges separately from his criminal history because that conduct was included in his criminal history. He is mistaken. "Criminal history" includes "all criminal complaints against the respondent for which, *prior to the commission of a current offense*: (a) The allegations were found correct by a court. . . ." RCW 13.40.020(9) (emphasis added). The State had charged J.W.M. with fourth degree assault and harassment in July 2018 and he pleaded guilty to those charges in December 2019. Accordingly, the charges were not included in his criminal history because they were not "found correct by a court" until he pleaded guilty to them after he committed the instant offense. *Id.* On remand, the court may consider these

29

*State v. J.W.M.*, No. 100894-5

offenses as "other complaints which have resulted in diversion or a finding or plea of guilty but which are not included as criminal history." RCW 13.40.150(3)(i)(vii).

Finally, J.W.M. contends the court failed to thoroughly consider all of the mitigating evidence and expressly weigh it against the aggravating factors. While the court may not have weighed the mitigating factors in the way J.W.M. argues it should have, the record does not indicate that the court overlooked the mitigating evidence. The court stated that it had "look[ed] deeply at all the circumstances of this case; and, specifically, the circumstances of [J.W.M.]." VTP at 40. It also expressly considered J.W.M.'s childhood, noting that J.W.M. "had a traumatic series of early years in Kenya; he had culture shock, and fell in with bad peers as soon as he got here, probably in an attempt to belong." *Id.* at 42. The court also adopted the JPC's report, which extensively detailed J.W.M.'s history. CP at 31 (FF 4). Given that the record shows the court considered the required mitigating factors under RCW 13.40.150(h), J.W.M. does not establish an abuse of discretion.

To summarize, we have considered J.W.M.'s arguments concerning the juvenile court's exercise of sentencing discretion in order to provide guidance on remand. While we reject most of his claims, we agree that the court may not consider unproven conduct that J.W.M. has not admitted to committing. To provide additional guidance, we next address the proper interpretation of RCW 13.40.300(2).

*State v. J.W.M.*, No. 100894-5

III.   When a Juvenile at Age 16 or 17 Commits a Violent Offense While Armed With a Firearm, the Juvenile Court Has Statutory Authority to Impose a Manifest Injustice Disposition of Confinement until Age 25

J.W.M. argues the trial court exceeded its statutory authority under RCW 13.40.300(2) by committing him to JRA until age 25.[6]  He interprets this statute as authorizing juvenile courts to commit a juvenile "found to be armed with a firearm and sentenced to an additional twelve months pursuant to RCW 13.40.193(3)(b)" to JRA beyond their 21st birthday only to effectuate the mandatory 12-month firearm enhancement.  RCW 13.40.300(2).  We reject J.W.M.'s interpretation because he overemphasizes the "additional 12-months" language and reads it in isolation, ignoring the relationship between RCW 13.40.300(2) and RCW 13.40.193(3)(b).

We review issues of statutory interpretation de novo.  *B.O.J.*, 194 Wn.2d at 323 (quoting *BNSF*, 192 Wn.2d at 837).  The goal of statutory interpretation is to carry out the legislature's intent, and we begin with the plain language of the statute. *Id.*  Our inquiry ends if the plain language of the statute is unambiguous.  *Id.* (citing *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007)).  When the plain language leads to more than one reasonable interpretation, the statute is ambiguous

---

[6]  For the first time in his supplemental briefing, J.W.M. also argues his disposition violates RCW 13.40.160(11), which prohibits a juvenile court from imposing a disposition that would exceed what an adult could face for the same offense.  Because this issue was not timely raised, we decline to address it.

31

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and we "may then look to legislative history as a further indication of legislative intent." *Id.* (citing *Armendariz*, 160 Wn.2d at 110-11).

Generally, juvenile courts may not commit juvenile offenders to JRA beyond their 21st birthday. *Id*. However, RCW 13.40.300(2) provides two exceptions to this general rule. The first, not at issue here, is when a 16- or 17-year-old offender is adjudicated of an A++ juvenile disposition category offense, specifically first degree robbery or drive-by shooting. RCW 13.40.300(2); RCW 13.40.0357 (defining A++ offenses). The second exception applies in J.W.M.'s case. A 16- or 17-year-old offender adjudicated of a violent offense and "found to be armed with a firearm and sentenced to an additional twelve months pursuant to RCW 13.40.193(3)(b), may be committed by the juvenile court to [JRA] . . . up to the juvenile offender's twenty-fifth birthday, but not beyond." RCW 13.40.300(2).

Interpreting this second exception requires us to determine how the phrase, "or found to be armed with a firearm and sentenced to an additional twelve months pursuant to RCW 13.40.193(3)(b)" relates to "may be committed by the juvenile court to [JRA] . . . up to the juvenile offender's twenty-fifth birthday, but not beyond." *Id*. We first look to RCW 13.40.193, which provides the length of confinement for various firearm-related juvenile offenses. The section of that statute applicable to the interpretation question before us mandates an additional 12-months of confinement when a juvenile is (1) 16 or 17 years old at the time of the offense

32

*State v. J.W.M.*, No. 100894-5

and (2) found to be armed with a firearm during the commission of "any violent offense as defined in RCW 9.94A.030." RCW 13.40.193(3)(b). In this respect, RCW 13.40.300(2)'s reference to "juvenile offenders . . . found to be armed with a firearm and sentenced to an additional twelve months pursuant to RCW 13.40.193(3)(b)" is synonymous with juvenile offenders found to have committed a violent offense as defined in RCW 9.94A.030 at age 16 or 17 while armed with a firearm.

We next look to how this reference relates to the maximum disposition a court can impose on a juvenile offender found to have committed a violent offense at age 16 or 17 while armed with a firearm. J.W.M. contends the "sentenced to an additional twelve months" language should direct how we interpret this reference. He argues a juvenile court cannot commit a juvenile to JRA until age 25 "simply because a 12-month firearm sentence is being imposed." Mot. for Discr. Rev. at 30. J.W.M. is correct that RCW 13.40.300(2) does not authorize a juvenile court to impose a disposition until age 25 "simply because a 12-month firearm sentence is being imposed." *Id.* But his interpretation does not account for how the statute limits both standard range dispositions and manifest injustice dispositions. As discussed above, once a court makes a manifest injustice determination, it has broad discretion to set the form and length of that disposition. *M.L.*, 134 Wn.2d at 660. The plain language of RCW 13.40.300(2) caps the length of manifest injustice

33

*State v. J.W.M.*, No. 100894-5

dispositions at age 25 for two categories of offenses committed by 16- to 17-year-olds: A++ offenses and violent crimes committed while armed with a firearm.

J.W.M. argues we cannot read the statute this way because the words "manifest injustice disposition" do not appear anywhere in RCW 13.40.300. Relying on *State v. Bacon*, he urges us to construe the sentencing statute "narrowly, without giving authority to impose manifest injustice dispositions when not expressly included." Appellant's Reply to Mot. for Accelerated Rev. at 22 (Wash. Ct. App. No. 82604-2-I (2021)) (citing *State v. Bacon*, 190 Wn.2d 458, 463, 415 P.3d 207 (2018)). But his citation to *Bacon* is misplaced. That case presented a very different question: whether the JJA gives juvenile courts the statutory authority to *suspend* juvenile dispositions. *Bacon*, 190 Wn.2d at 459. We concluded the JJA does not provide such authority because the legislature specifically enumerated all situations when a juvenile court may suspend a disposition (found in RCW 13.40.160(10)). Because RCW 13.40.160(10) did not include RCW 13.40.160(2) (the provision under which Bacon was sentenced), the juvenile court did not have the authority to suspend the disposition. *Id.* at 466-67. Here, we are asked whether the juvenile court is authorized to *impose* a manifest injustice disposition and, if so, for how long. *Bacon* is not on point because juvenile courts have broad discretion in imposing manifest injustice dispositions, and RCW 13.40.300(1) and (2) clearly limit the length of those dispositions.

34

*State v. J.W.M.*, No. 100894-5

J.W.M. argues that even if we find RCW 13.40.300 applicable to manifest injustice dispositions, age 21 is the upward maximum age for confinement. To support this proposition, he cites *D.L.* where we said, "The upward maximum of a manifest injustice disposition is confinement until age 21." 197 Wn.2d at 514. This argument fails for two reasons. First, the statement in *D.L.* cannot be read in isolation to ignore the exception created by RCW 13.40.300(2), which plainly authorizes juvenile courts to commit certain juveniles to JRA up to age 25. Second, even under J.W.M.'s interpretation, the statute would allow a court to confine a juvenile beyond age 21 so long as it was to effectuate the 12-month firearm enhancement.

Our interpretation of RCW 13.40.300 aligns with the legislature's expressed intent. The final bill report for Engrossed Second Substitute Senate Bill 6160, which amended RCW 13.40.300 to expand JRA jurisdiction to age 25 for certain offenses, describes the amendments as "transferr[ing] from the exclusive original jurisdiction of adult court to the exclusive original jurisdiction of juvenile court"

> the following offenses . . . when committed by a youth aged 16 or 17: . . . *any violent offense when the juvenile is alleged to have been armed with a firearm . . . the age limit for placement in a juvenile institution is increased to 25 years of age for juveniles aged 16 or 17* who are convicted of robbery 1, drive by shooting, *or who receive a 12-month firearm sentencing enhancement.*

FINAL B. REP. ON ENGROSSED SECOND SUBSTITUTE S.B. 6160, at 2-3, 65th Leg., Reg. Sess. (Wash. 2018) (emphasis added). Committee staff also described the purpose

35

of this provision as "open[ing] up the possibility of exceptional sentences upwards . . . until the juvenile's 25th birthday." Hr'g on S.B. 6160 Before the S. Hum. Servs. & Corr. Comm., 65th Leg., Reg. Sess. (Wash. Jan. 10, 2018), *videorecording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/senate-human-services-corrections-committee-2018011091 /?eventID=2018011091.

We hold that the plain language of RCW 13.40.300(2), read in context with the rest of the JJA, permits a court to impose a manifest injustice disposition upward to age 25 for two categories of juvenile offenses when committed at age 16 or 17: (1) A++ offenses and (2) violent offenses committed while armed with a firearm. J.W.M.'s offense falls into the second category of RCW 13.40.300(2) because a jury found him guilty of second degree manslaughter and found he was armed with a firearm while committing the offense.

The remaining issue concerns J.W.M.'s belated due process argument that he did not receive sufficient notice of the possibility of a manifest injustice disposition before trial in adult court. For the reasons explained below, we decline to address this argument raised for the first time on appeal, as J.W.M. has not demonstrated manifest constitutional error for purposes of review under RAP 2.5(a)(3).

36

*State v. J.W.M.*, No. 100894-5

IV.  J.W.M. Has Not Shown Manifest Constitutional Error Resulted from the State's Failure To Provide Him with Pretrial Notice in Adult Court of a Possible Manifest Injustice Disposition in Juvenile Court

Relying on our holdings in *M.S.* and *D.L.*, J.W.M. asserts the State violated his due process rights by failing to provide him with pretrial notice in adult court of the factual basis and aggravating factors supporting his manifest injustice disposition. This required notice, argues J.W.M., must be formal, written, and include the State's intent to seek such a disposition.

J.W.M. admits he did not raise this issue below, but he urges us to review this claim because *M.S.* and *D.L.* stand for the proposition that "[a] violation of the constitutional right to notice may be addressed for the first time on appeal." Pet'r's Suppl. Br. at 9 (citing *D.L.*, 197 Wn.2d at 511; *M.S.*, 197 Wn.2d at 458). But the pages he cites in *M.S.* and *D.L.* do not support a blanket exception to the general rule against reviewing unpreserved constitutional error, and nowhere in those cases do we suggest a departure from RAP 2.5(a)(3), which requires consideration of whether an unpreserved error is of constitutional magnitude and is manifest on the record. We therefore analyze his claim through the lens of that appellate rule.

"To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (citing *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007)). We do not

37

*State v. J.W.M.*, No. 100894-5

assume the alleged error is constitutional; instead, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *Id.* (citing *State v. Scott*, 110 Wn.2d 682, 687, 689-91, 757 P.2d 492 (1988)). Proof that an alleged error is manifest "'requires a showing of actual prejudice.'" *Id*. at 99. (quoting *Kirkman*, 159 Wn.2d at 935). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 935). "In determining whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim." *Id.* (citing *Kirkman*, 159 Wn.2d at 935). "'If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest.'" *Id.* (quoting *Kirkman*, 159 Wn.2d at 935). A manifest constitutional error remains subject to a harmless error analysis. *Id.* at 98 (citing *McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

J.W.M. alleges a violation of his due process right to notice. The United States Supreme Court and this court have consistently held that due process requires notice to be meaningful. *See, e.g.*, *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *State v. Shaffer*, 120 Wn.2d 616, 845 P.2d 281 (1993). "The

*State v. J.W.M.*, No. 100894-5

quintessential requirement of notice is that it must be given at a sufficiently meaningful time so as not to prejudice the defendant." *D.L.*, 197 Wn.2d at 515. Notice satisfies due process when given "sufficiently in advance of scheduled court proceedings" such that a defendant has a reasonable amount of time to prepare an adequate defense. *In re Gault*, 387 U.S. at 33. The proper time to receive notice of aggravating circumstances is "prior to the proceeding in which the State seeks to prove those circumstances." *State v. Siers*, 174 Wn.2d 269, 277, 274 P.3d 358 (2012).

In the companion cases of *M.S.* and *D.L.*, we held due process requires the State to provide juvenile offenders with "notice of the factual basis necessary to support a manifest injustice sentence before deciding to plead guilty." *M.S.*, 197 Wn.2d at 456; *see also D.L.*, 197 Wn.2d at 511 ("[M]anifest injustice dispositions cannot be based on facts that the juvenile did not have notice of at the time of plea."). We determined this notice satisfies due process when provided to the juvenile prior to entering a guilty plea. *M.S.*, 197 Wn.2d at 455-56; *see also D.L.*, 197 Wn.2d at 511. Preplea notice is meaningful because "that is the critical point at which the juvenile will consider whether [to] go to trial or to plead guilty." *M.S.*, 197 Wn.2d at 465. Providing notice of facts only after a plea "undermines juveniles' ability to make an informed decision because the factual basis of the ultimate disposition at the time of the plea remains unknown." *Id.*

39

*State v. J.W.M.*, No. 100894-5

In both *M.S.* and *D.L.*, we held that the State's notice of aggravating facts supporting a manifest injustice disposition was constitutionally deficient because it did not provide the juvenile adequate time to weigh those facts before pleading guilty. In *M.S.*, the juvenile court based its manifest injustice determination in part on M.S.'s failure to abide by the deferred disposition that he received in exchange for a guilty plea. 197 Wn.2d at 458. Because these facts occurred after M.S. had pleaded guilty, he had no way to consider them when deciding whether to enter into a plea agreement. We determined he did not have adequate notice and reversed his manifest injustice disposition. *Id.* at 468. In *D.L.*, the court based its manifest injustice determination on facts relayed in a juvenile probation counselor's memorandum. 197 Wn.2d at 512. We concluded this violated due process because D.L. entered his plea "based on a specific set of stipulated facts found in the probable cause statement" and "[n]either D.L. nor his attorney would have been able to predict that the State would rely on" the facts presented in the JPC memorandum. *Id.* at 517. In each case, the State's notice of the factual basis supporting the manifest injustice disposition was not meaningful because it was provided after the juvenile had pleaded guilty.

For the first time on appeal, J.W.M. asks this court to apply the holdings of *M.S.* and *D.L.* and find that the State violated his due process rights by failing to notify him before trial in adult court of a possible manifest injustice disposition. For

40

*State v. J.W.M.*, No. 100894-5

the reasons below, we find these cases inapplicable. Nothing in *M.S.* and *D.L.* support recognition of a constitutional right to pretrial notice in adult court of the factual and aggravating circumstances of a manifest injustice disposition that would be possible only if the case returned to juvenile court. Accordingly, J.W.M. has not demonstrated manifest constitutional error within the meaning of RAP 2.5(a) to justify consideration of his late-raised challenge.

As a preliminary matter, J.W.M. contends the notice requirement announced in *M.S.* and *D.L.* requires the State to provide formal, written notice of its intent to seek a manifest injustice disposition. However, there is no support for such a formal notice requirement in either *M.S.* or *D.L.* In fact, we expressly stated the *opposite*: "we have found notice of aggravating factors to be sufficient even without a formal colloquy or charging document, and we do not impose these formalities here." *D.L.*, 197 Wn.2d at 518 (citing *Siers*, 174 Wn.2d at 277). We reasoned in *M.S.* that the State "will have to assert facts and aggravators initially *to preserve the ability to seek a manifest injustice disposition*," suggesting that the State need not provide notice of its *intent*. 197 Wn.2d at 466 (emphasis added); *see also State v. Whittington*, 27 Wn. App. 422, 426, 618 P.2d 121 (1980) ("It is not necessary for the State to include its intent to seek a finding of manifest injustice in the information charging the juvenile with the underlying crime."). Consistent with prior case law, we reject

41

*State v. J.W.M.*, No. 100894-5

J.W.M.'s assertion that due process requires formal, written notice of the State's intent to seek a manifest injustice disposition.

That leaves J.W.M.'s main argument that *M.S.* and *D.L.* require meaningful notice at a meaningful time of the factual and aggravating factors supporting a manifest injustice disposition. As discussed above, *M.S.* and *D.L.* held that due process requires preplea notice of the factual basis and aggravating factors supporting a manifest injustice disposition so that a juvenile may make an informed plea decision. *M.S.*, 197 Wn.2d at 456; *see also D.L.*, 197 Wn.2d at 511. The question is whether these cases support the assertion that due process entitled J.W.M. to pretrial notice in adult court of a possible manifest injustice disposition should the case return to juvenile court for disposition. They do not.

For one, the factual and legal circumstances of J.W.M.'s case differ significantly from *M.S.* and *D.L.* Unlike in *M.S.* and *D.L.*, J.W.M. did not enter into a plea deal; he proceeded to trial in adult court and was found guilty on lesser included charges that were not subject to the auto decline statute. Indeed, he went to trial following unsuccessful plea negotiations on charges that would have required sentencing in adult court upon a finding of guilt. The possibility of a manifest injustice disposition in juvenile court arose only after the jury convicted J.W.M. of the lesser included crime, which caused the case to return to juvenile court. In both *M.S.* and *D.L.*, in contrast, the case was always under the juvenile court's

42

jurisdiction. Our reasoning in those cases does not support requiring notice prior to trial in adult court of a possible manifest injustice disposition in juvenile court.

Rather, *M.S.* and *D.L.* require notice of facts at a meaningful time; we believe the State met its notice requirement when it provided J.W.M. with notice of the factual basis and aggravating factors supporting the manifest injustice disposition more than two weeks prior to his disposition hearing. As stated above, *M.S.* and *D.L.* rest on the premise that notice is meaningful when juveniles "have all available information to prepare to meet the allegations" of the manifest injustice disposition. *M.S.*, 197 Wn.2d at 468 ("Juveniles must be given notice of all facts used to impose a manifest injustice disposition so that they have all available information to prepare to meet the allegations . . . ."); *D.L.*, 197 Wn.2d at 515 ("quintessential" requirement of notice is to provide notice at reasonable time for the defendant to mount an adequate defense); *accord Siers*, 174 Wn.2d at 277 (notice must be provided "prior to the proceeding in which the State seeks to prove those circumstances"). Here, J.W.M. would need to be prepared to address the facts supporting the State's recommended manifest injustice disposition at the juvenile court disposition hearing, not during trial in adult court. And J.W.M. would face those facts only in the event the jury found him guilty of a lesser included offense that required a return to juvenile court. Adopting J.W.M.'s rule would essentially require notice be given before the relevant facts are even known, which undermines the quintessential

43

*State v. J.W.M.*, No. 100894-5

requirement of *meaningful* notice. Notice of facts supporting a manifest injustice disposition is meaningful only when the facts are known, and it is timely if the juvenile offender has a meaningful opportunity to prepare to meet the alleged facts prior to the disposition hearing. J.W.M. points to no theory of due process that requires more.

Nor does the record below demonstrate a manifest constitutional error based on a lack of meaningful notice. J.W.M. mounted a defense against the State's recommended manifest injustice disposition: He timely prepared a presentencing report directly challenging the State's reasoning for its manifest injustice disposition recommendation. At the disposition hearing, defense counsel urged the court not to exceed the standard range considering J.W.M.'s traumatic history, his youthfulness at the time of the offense, and his maturity over the last three years. J.W.M. never sought a continuance or otherwise indicated that he needed more time to mount an adequate defense. On this record, he has not identified actual prejudice necessary to show a manifest error. *O'Hara*, 167 Wn.2d at 98. Accordingly, we decline to reach the merits of J.W.M.'s unpreserved due process claim because he has not met the requirement of RAP 2.5(a)(3) to demonstrate a manifest error of constitutional magnitude.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONCLUSION

We reverse J.W.M.'s disposition and remand for a new disposition hearing because the juvenile court based its manifest injustice determination on J.W.M.'s treatment needs, contrary to our holding in *B.O.J.*, 194 Wn.2d 314. On remand, if based on a proper manifest injustice finding, the court may impose a manifest injustice disposition of confinement until age 25 pursuant to RCW 13.40.300(2) because J.W.M., at the age of 17, committed a violent offense while armed with a firearm. In exercising sentencing discretion, the juvenile court cannot consider unproven conduct not admitted to by J.W.M., as this is not an appropriate aggravating factor. However, it may consider J.W.M.'s original charged conduct in his two past plea agreements along with his fourth degree assault and harassment charges. Finally, we decline to reach J.W.M.'s unpreserved due process notice claim because he has failed to show manifest constitutional error under RAP 2.5(a)(3).

_____
Stephens, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

46

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100894-5

GORDON McCLOUD, J. (concurring)—I agree with the majority's

decision to reverse and remand for a new disposition hearing because the trial court

erred in basing its manifest injustice disposition on the juvenile's need for services.

Majority at 2. I also agree with the majority's guidance on two additional issues,

i.e., (1) that RCW 13.40.300(2) authorizes a manifest injustice disposition up to

age 25 when a 16- or 17-year-old commits a violent offense while armed with a

firearm and (2) that the court below erred in considering charged but unproven

conduct to which J.W.M. did not admit. *Id.*

I write separately only to comment on the majority's discussion of the final

issue. The majority holds that our court rule RAP 2.5(a)(3) requires it to explain

why it cannot give the trial court guidance on whether the State must provide

J.W.M. with pretrial notice in adult court of the factual basis and aggravating

factors that might support a manifest injustice disposition if the case were to be

remanded to juvenile court; the majority continues that the reason it cannot give

such guidance is that upon a thorough review of the merits and possible prejudice

1

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

posed by this constitutional claim, the claim fails; the majority therefore concludes

that since the claim fails on the merits, J.W.M. has no right to even have that claim

(which the majority just reviewed on the merits) reviewed on the merits. Finally,

the majority states that because J.W.M. lacks such a right to review, we decline to

give guidance on that issue (even though the majority did give guidance on that

issue).

I don't think that the majority has miscited any of our cases or misapplied

any of our precedent. But this interpretation of RAP 2.5(a)(3) is so confusing, is so

cumbersome, and poses such a conflict with the plain language of the rule, that I

am compelled to comment on the absurdity of this interpretation.

I therefore respectfully concur.

ANALYSIS

RAP 2.5(a) states that an "appellate court may refuse to review any claim of

error which was not raised in the trial court." The rule then provides three

exceptions to this discretionary bar on review. The exception at issue in this case

is for a "manifest error affecting a constitutional right." RAP 2.5(a)(3).

RAP 2.5(a) was adopted by this court in part to promote the "efficient use of

judicial resources." *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). The

rule "encourages parties to make timely objections, gives the trial judge an

opportunity to address an issue before it becomes an error on appeal, and promotes

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

the important policies of economy and finality." *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015) (citing *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). Specifically, the policy underlying RAP 2.5(a)(3) is that "[a]ppellate courts will not waste their judicial resources to render definitive rulings on newly raised constitutional claims when those claims have no chance of succeeding on the merits." *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999). In other words, this rule was designed in part to relieve appellate courts of the inefficiencies involved in reviewing clearly nonmeritorious constitutional claims that were not raised in the trial court, and in part to make sure appellate courts do review potentially meritorious constitutional claims despite counsel's failure to raise them in the trial court.

On reflection, I don't think that the rule has achieved those goals.

Instead, RAP 2.5(a)(3) has made our review process—and the Court of Appeals' review process—less efficient without any corresponding benefit. Our court, for example, has often interpreted RAP 2.5(a)(3) to require a complete review of constitutional claims raised for the first time on appeal as a first step. *E.g.*, *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995). These opinions tend to be circular because they address the substantive constitutional issue first, on the way to deciding whether or not there is a constitutional issue worthy of review. *See, e.g.*, *O'Hara*, 167 Wn.2d at 104-09 (trial court did not

3

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

violate defendant's due process rights by failing to provide the full statutory

definition of "malice"; therefore claim does not meet RAP 2.5(a)(3)'s requirements

and court need not review claim of constitutional error).

RAP 2.5(a)(3) has also made the process of reviewing similar constitutional

claims raised in subsequent cases less efficient.  The reason is that when an

appellate court decision analyzes a constitutional claim solely as a preliminary step

toward determining whether the merits of that claim can be raised for the first time

on appeal, and then concludes that the claim cannot be raised for the first time on

appeal, it makes the precedential value of the entire merits discussion suspect. *On

the Merits*, THE LAW DICTIONARY ("On the merits" defined as "a decision of the

court . . . based on presented facts and not technical legal practice.")

https://thelawdictionary.org/on-the-

merits/#:~:text=ON%20THE%20MERITS%20Definition%20%26%20Legal%20

Meaning&text=term%20used%20by%20a%20court,and%20not%20technical%20l

egal%20practice [https://perma.cc/M7QB-U85P].

This case exemplifies those problems with our interpretation of RAP

2.5(a)(3).

First, the majority did not just apply RAP 2.5(a)(3) to decide whether it

could reach the merits of J.W.M.'s due process/notice claim for the first time on

appeal.  It applied RAP 2.5(a)(3) to decide whether it could, in its discretion,

4

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

provide guidance to the trial court on that claim, which is unnecessary to the

decision, because the majority already reverses, quite correctly, on a different

ground.[1]  The majority need not reach any further issues.

But it goes on to analyze three additional issues to "provide guidance to the

lower court on remand."  Majority at 2.  For two of those issues, the guidance is

clear.  The claims were preserved for appeal, and the majority provides useful

guidance.

But for the third issue—the notice/due process issue—the majority applies

RAP 2.5(a)(3), does a thorough and careful analysis, and then concludes that it

turns out review was not available at all, so we cannot provide guidance at all.

Majority at 9, 38-44.  That's quite a lot of analysis for the conclusion that we

cannot provide guidance on an issue that we need not address anyway.

Clearly, RAP 2.5(a)(3) is not perfectly clear.  Our court has interpreted its

language in different ways at different times. *See Scott*, 110 Wn.2d at 688

("manifest" means an error that "is truly of constitutional magnitude"); *State v.*

*Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007) (defining "manifest" as a

showing of actual prejudice (citing *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591

(2001); *McFarland*, 127 Wn.2d at 333-34)); *WWJ Corp.*, 138 Wn.2d at 603

---

[1] The majority correctly holds that J.W.M.'s manifest injustice disposition cannot
be justified by the juvenile's need for services and therefore remands for a new
disposition hearing. Majority at 2.

5

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

(interpreting "manifest" to require a developed record). And we do not amend court rules through litigation.

But I would suggest that the rule's language permits a different and more efficient process.

First, this rule's plain language allows for review of a "manifest error *affecting* a constitutional right." RAP 2.5(a)(3) (emphasis added). "Affect" is defined as "[t]o act upon; influence; change; enlarge or abridge." THE LAW DICTIONARY

https://thelawdictionary.org/affect/#:~:text=To%20act%20upon%20%3B%20influ ence%3B%20change%20%3B%20enlarge%20or%20abridge

[https://perma.cc/7AKT-662G]. RAP 2.5 does not limit review to manifest errors completely denying but, rather, to those "affecting" or "influenc[ing]" a constitutional right. The majority in this case correctly acknowledges that the timing of notice of potential manifest injustice factors can "affect[]" a constitutional right. *See* majority at 38-40. I would therefore interpret the rule to allow appellate review of the notice issue.

Second, RAP 2.5(a)'s barriers to review are all *discretionary*. RAP 2.5 is clear about that point; it begins, "The appellate court *may* refuse to review any claim of error which was not raised in the trial court." (Emphasis added.) We have already interpreted the word "may" in that introductory sentence as

6

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

discretionary. *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015) ("Although a defendant has the obligation to properly preserve a claim of error, an appellate court may use its discretion to reach unpreserved claims of error consistent with RAP 2.5."). Applying that discretionary language in this case would allow the majority to acknowledge that this claim was not raised in the trial court but to exercise its discretionary authority to address it anyway.

Both of these suggested routes would transform the majority's thorough discussion and analysis of the notice/due process issue from a step on the way to a procedural bar into a real decision on the merits. Both of these suggested routes would also go a long way toward encouraging other appellate courts to provide equally thorough discussions and analyses of such constitutional issues that are raised for the first time on appeal, without the inefficient overlay of the procedural morass.

CONCLUSION

I agree with the majority that the trial court cannot base a manifest injustice disposition on a juvenile's need for services. I also agree with the majority's additional guidance that RCW 13.40.300(2) authorizes a manifest injustice disposition up to age 25 in certain cases and that the trial court erred in considering charged but unproven conduct to which J.W.M. did not admit. Majority at 2.

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. J.W.M.*, No. 100894-5
(Gordon McCloud, J., concurring)

I write separately only to note that this court's interpretation of RAP 2.5(a)(3) has strayed from the rule's plain language and stated intent. It has strayed from the rule's plain language by requiring an appellant to prove that the claimed error fully denied, not just "affect[ed]," the constitutional right at issue. It has also strayed from the rule's plainly discretionary language. And it has strayed from the rule's intent by making the review process more cumbersome without any corresponding benefit to achieving binding precedent on the merits.

With these observations, I respectfully concur.

_____
Gordon McCloud, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.